**In the Matter of the ADOPTION of A.M.B.**

**Appeal of: J.B.,**

Superior Court of Pennsylvania.

Argued April 9, 2002.

Filed Oct. 17, 2002.

**660**

Michael J. Nies, Erie, for appellant.

Michael R. Cauley, Erie, for Erie County Children and Youth Services, appellee.

Before: MUSMANNO, ORIE MELVIN and TAMILIA, JJ.

TAMILIA, J.

¶ 1 Mother, J.B., appeals from the September 14, 2001 Decree involuntarily terminating her parental rights to her daughter, A.M.B. On appeal, mother challenges whether the orphans' court erred in failing to grant her petition to voluntarily relinquish her rights to the child. For the reasons that follow, we affirm.

¶ 2 A.M.B. was born on February 2, 2000 in Erie, Pennsylvania. Erie County Juvenile Court adjudicated her dependent on February 24, 2000, after she was placed in the care and custody of Erie County Office of Children and Youth (OCY) at birth. Following the adjudication of dependency hearing, a dispositional and placement hearing was held on March 3, 2000. Permanency review hearings were held on September 14, 2000 and November 29, 2000. At the September 14, 2000 hearing, the juvenile court continued with the placement goal as reunification. At the November 29, 2000 hearing, however, mother indicated to the juvenile court that she wished to voluntarily surrender her parental rights to the child. Although the juvenile court authorized mother to proceed with voluntarily relinquishment, she did not file a petition.[1]

¶ 3 On January 5, 2001, OCY filed a petition for the involuntary termination of mother's parental rights to the child. Subsequently, on April 12, 2001, mother filed a petition for the voluntary relinquishment of her parental rights to the child. Thereafter, OCY filed an Answer and New Matter to mother's petition asserting its refusal to consent to mother's petition or to join mother's petition. The orphans' court held a hearing on both petitions on May 9, 2001. Thereafter, on August 2, 2001, the orphans' court denied mother's petition. On August 29, 2001, mother filed a notice of appeal, which this Court quashed. *In re Adoption of A.M.B.*, No. 1557 WDA 2001 (Pa.Super. filed 10/16/01). The orphans' court entered an Order involuntarily terminating mother's parental rights to the child on September 14, 2001. The court found clear and convincing evidence to ter-

minate appellant's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1),(2),(5), and (8). On October 5, 2001, mother filed this appeal.

¶ 4 Mother does not challenge whether the orphans' court erred in involuntarily terminating her parental rights. Her sole claim concerns whether the orphans' court instead should have granted her petition to voluntary relinquish her parental rights. Specifically, mother requests this Court to consider:

> Whether the Orphans' Court erred in denying her Petition for Voluntary Relinquishment of Parental Rights when
>
> . . .
>
> A. mother was ready, willing, and able to voluntarily give up her rights; and,
>
> B. the denial did not serve the best interests and welfare of the child?

*See* Appellant's brief at 1.

¶ 5 Our standard of review when considering an appeal from an orphans' court Order is as follows:

> When reviewing [an Order] entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the [Orphans' Court's] factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of that discretion.

*In re Adoption of A.J.B.*, 797 A.2d 264, 266 (Pa.Super.2002), reargument denied, 5/22/02 (internal quotations and citations omitted.)

---

**1.** This appears to be the tipping point in this case, wherein the mother, in failing to proceed with voluntary relinquishment, triggered the necessity for the agency petitioning for involuntary termination, thereby committing the court to the action pursued and the ultimate decision under review.

¶ 6 Recently, in *A.J.B.*,[2] this Court determined the orphans' court properly granted mother's petition to voluntarily relinquish her parental rights to A.J.B. The facts reveal that A.J.B. was adjudicated dependent and placed in the care and custody of OCY. Following permanency hearings, the orphans' court granted OCY's request to proceed with involuntary termination of mother's parental rights. At the time of the involuntary termination hearing, however, mother indicated she wished to voluntarily relinquish her parental rights. OCY objected on the basis that, pursuant to 23 Pa.C.S.A. § 2501, **Relinquishment to agency,** a petition by mother and consent by OCY were prerequisites to voluntary relinquishment of mother's parental rights. Mother then filed a petition to voluntarily relinquish her parental rights, but OCY refused to consent. The orphans' court rejected OCY's arguments in support of its refusal to consent and issued an Order denying OCY's request for a hearing on its involuntary termination of parental rights petition, and denying OCY's motion to dismiss mother's voluntary relinquishment petition. OCY appealed.

¶ 7 In affirming the Order, this Court reasoned as follows:

A.J.B. has been in the care and custody of OCY since November 9, 1999. OCY filed a petition to terminate Mother's parental rights to A.J.B. so that the child could be placed for adoption. These circumstances evidence OCY's implicit consent to accept custody of A.J.B. Moreover, there is a strong public policy interest that is served by dispensing with the requirement of an agency's consent to a voluntary relinquishment petition under the circumstances of a case

such as this [one].... Where a parent believes that he or she cannot provide adequate care for a child, or where a parent has abused or neglected or is likely to abuse or neglect a child, it would be imprudent for this Court to place impediments in the way of the voluntary relinquishment of parental rights to a child who previously has been adjudicated dependent. If OCY is permitted to withhold unreasonably its consent to a voluntary relinquishment petition and insist instead on an involuntary termination of parental rights for the sole reason of being able to apply aggravating circumstances to any future dependency proceeding, it is possible that a parent will refrain from voluntarily relinquishing his or her parental rights under the appropriate circumstances, based on a fear of the agency's opposition or the consequences in future proceedings. Such an effect could have tragic results in the event an agency is unsuccessful in its petition to involuntarily terminate a parent's parental rights, not only by frustrating the agency's goal of placing the child in a permanent adoptive home, but perhaps by returning a child to a home where he or she is at risk of further abuse or neglect.

*Id.* at 11–12.

¶ 8 The orphans' courts in both *A.J.B.* and this case had before them petitions by the mothers for voluntary relinquishment, pursuant to 23 Pa.C.S.A. § 2501, **Relinquishment to Agency,** and petitions for involuntary termination pursuant to 23 Pa. C.S.A. § 2512, **Petition for involuntary termination.** Moreover, in both instances OCY refused to consent to the voluntary relinquishment petitions. Nonetheless, we

**2.** We recognize that the orphans' court judge in this matter did not have the benefit of our decision rendered in *Adoption of A.J.B.*, 797 A.2d 264 (Pa.Super.2002), reargument denied, 5/22/02.

find that *A.J.B.* is distinguishable from the instant case.

¶ 9 In *A.J.B.*, the orphans' court considered only the petition for voluntary relinquishment and granted it, whereas in this case, the court considered both the voluntary relinquishment and the involuntary termination petitions, and granted the Order requested by OCY after conclusive evidence and findings of fact that involuntary termination was appropriate. As the procedural posture of this case is different than *A.J.B.*, we decline to find that the orphans' court was required to consider only mother's petition to voluntarily relinquish her parental rights. Upon review of the matter before us, we find the orphans' court properly exercised its discretion in granting the petition to involuntarily terminate mother's parental rights.

¶ 10 In pursuing this review, we look to the issues advanced by the mother in the order presented. First, mother maintains she was willing and able to voluntarily relinquish her rights, with the implication therefore being that the agency could not deny her the right to do so.[3] Secondly, she contends denial of voluntary relinquishment was not in the best interest and welfare of the child and this mandated the orphans' court to order the agency to consent.

¶ 11 These contentions can be considered simultaneously as the basis for the application by mother is derivative from the precedent established from *A.J.B.*

### DISCUSSION

¶ 12 In support of its holding, the *A.J.B.* Court relied on *In re Adoption of Hess*, 530 Pa. 218, 608 A.2d 10 (1992), which held

that grandparents, who previously had cared for the two children in question and had custody of their siblings, had standing to petition for adoption of the children who had been placed in an adoptive home after the Family and Children's Service had acquired custody through the natural parents' consent to adoption. Following a hearing to confirm consent, the parental rights of the birth parents were terminated. In reversing the orphans' court, this Court and the Supreme Court held that, in an adoption following termination of the rights, it is in the children's best interest to have grandparents considered as prospective adoptive parents, notwithstanding the objection of the family service agency which stands in *loco parentis* to the child and may otherwise exercise such authority concerning the child (to consent) as a natural parent could exercise. 23 Pa.C.S.A. § 2521(c), **Authority of agency or person receiving custody.** *Hess* does not require this Court, under the facts of this case or *A.J.B.*, to override the statutory authority of the agency, OCY, to grant or deny consent to accept relinquishment of a child by the parent into its custody. In *Hess*, this already had been achieved and the Supreme Court, looking to the best interest of the child *when adoption was imminent following termination*, held the agency could not deny intervention by the grandparents as they had the right to intervene initially pursuant to Pa.R.C.P. 2327, **Who May Intervene.** The grandparents were not notified initially and were precluded from participating in the adoption proceeding, despite considerable involvement with the children prior to termination of parental rights.

---

**3.** This contention standing alone is questionable. As detailed above, mother failed to file her petition for voluntary relinquishment in a reasonable time following her offer to do so on November 29, 2000, and instead did not

pursue this action until April 12, 2001, almost six months following her offer and *only after* OCY filed its involuntary termination petition on January 5, 2001.

¶ 13 In *Chester County Children and Youth Services v. Cunningham,* 540 Pa. 258, 656 A.2d 1346 (1995)(plurality decision), the Supreme Court stated *Hess* applied to grandparents only; it was based only on the importance of consanguinity and the numerous legislative provisions unique to grandparents. *Id.* at 263, 656 A.2d at 1349. The case before us does not involve issues of standing or the right to intervene, but rather implicates new and different concepts, promulgated by federal and state legislation, relating to adoption of children. The thrust of that legislation and its impact on these cases and present adoption procedures are best reviewed in relation to *In the Interest of Lilley,* 719 A.2d 327 (Pa.Super.1998), and *C.B. ex rel. R.R.M. v. Commonwealth of Pennsylvania,* 567 Pa. 141, 786 A.2d 176 (2001), which deal with the nature and impact of the Adoption and Safe Families Act of 1997, 42 U.S.C. § 1305 *et seq.* (hereinafter ASFA). In essence, these cases hold that the federal and state laws to expedite adoptions and to provide adoption assistance must look to the safety and welfare of the child in physical care and to promote expeditious adoptions by minimizing the time a child will be in temporary care rather than in permanent or adoptive settings.

¶ 14 Voluntary relinquishment typically is utilized by a mother who is incapacitated or overwhelmed with the prospect of a newborn, or by parents who do so because of health reasons. Those seeking this option usually proceed through individuals or private agencies to place the child for adoption. Consent is required for voluntary relinquishment pursuant to 23 Pa. C.S.A. §§ 2501, **Relinquishment to agency;** 2502, **Relinquishment to adult in-** tending to adopt child; and 2504, **Alternative procedure for relinquishment.**

¶ 15 Where consent of both parents is not forthcoming and conditions are such that for the health and welfare of the child adoption is in order, the family service agency may pursue involuntary termination of parental rights in order to free the child for adoption in accordance with 23 Pa.C.S.A. § 2511, **Grounds for involuntary termination.** Voluntary relinquishment as noted above is the proceeding usually mandated when juvenile court and OCY are not involved and the decision to place a child for adoption is based on the parents' needs rather than the child's general welfare, which then becomes a collateral consideration. *See* footnote 7 *infra.* The *Hess* case, the *A.J.B.* case, and this case are different aspects of the diverse termination and adoption proceedings, are procedurally distinguishable and, to a certain extent, have different scopes of review due to the discrete stages of the bifurcated proceeding. As such, findings as between them are mutually exclusive and are dependent on the facts and legal posture of the case under review.

¶ 16 In both the matter before us and that of *A.J.B.,* following dependency adjudications and reasonable efforts at reunification, which required regularly scheduled permanency hearings in juvenile court, a change in goal from reunification to adoption and termination of parental rights was ordered. Pursuant to the Order changing the goal to adoption, petitions for involuntary termination of parental rights were filed by OCY. These were countered by the mothers' filing of petitions for voluntary relinquishment of parental rights in order to defeat the impact of a decree of involuntary termination as an aggravated circumstance[4] which could

---

**4.** **"Aggravated circumstances."** Any of the following circumstances:

(1) The child is in the custody of a county agency and either:

be available against the mothers in future cases wherein dependency proceedings take place involving other birth children.[5] In *A.J.B.*, the Court permitted voluntary termination on the newly created basis of "reasonableness," as in the best interest of the child, applying *Hess, supra*, as its authority. While best interest is the standard applied at the time of the adoption proceeding, it is not the standard of review applied by the court at termination proceedings which looks only to the general welfare of the child and whether the statutory requirements have been met for termination of parental rights. *See In the Interest of Coast*, 385 Pa.Super. 450, 561 A.2d 762 (1989), *appeal denied*, 525 Pa. 593, 575 A.2d 560 (1990). The status of the child is not enhanced or changed whether the termination results from parental relinquishment or involuntary termination. Either procedure frees the child for adoption with no detriment to the child. Parental relinquishment and involuntary termination are, however, mutually exclusive and a determination must be made as to which and when one or the other applies. This is a judicial function in which the judge exercises his discretion in conformity with the facts and the law.

¶ 17 The orphans' courts in both *A.J.B.* and this case had before them petitions by the mothers for voluntary relinquishment, 23 Pa.C.S.A. § 2501, **Relinquishment to Agency**, and 23 Pa.C.S.A. § 2512, **Petition for involuntary termination**. In *A.J.B.*, the orphans' court considered *only* the petition for voluntary relinquishment and granted it, whereas in this case, the court considered *both* the voluntary relinquishment and the involuntary termination petitions, and granted the Order requested by OCY after conclusive evidence and findings of fact that involuntary termination was appropriate. In *A.J.B.*, both the orphans' court and this Court held that OCY's refusal to consent to voluntary relinquishment was self-serving to effect the outcome of possible future litigation against the mother, who was again pregnant, whereas in this case, the orphans' court held that involuntary termination was appropriate based on the evidence and as mandated by statute.

(i) the identity of whereabouts of the parents is unknown and cannot be ascertained and the parent does not claim the child within three months of the date the child was taken into custody; or

(ii) the identity or whereabouts of the parents is known and the parents have failed to maintain substantial and continuing contact with the child for a period of six months.

(2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily .injury, sexual violence or aggravated physical neglect by the parent.

(3) The parent of the child has been convicted of any of the following offenses where the victim was a child:

(i) criminal homicide under 18 Pa.C.S. Ch. 25 (relating to criminal homicide);

(ii) a felony under 18 Pa.C.S. § 2702 (relating to aggravated assault), 3121 (relating to rape), 3122.1 (relating to statutory sexual assault), 3123 (relating to involuntary deviate sexual intercourse), 3124.1 (relating to sexual assault) or 3125 (relating to aggravated indecent assault).

(iii) A misdemeanor under 18 Pa.C.S. § 3126 (relating to indecent assault).

(iv) An equivalent crime in another jurisdiction.

(4) the attempt, solicitation or conspiracy to commit any of the offenses set forth in paragraph (3).

(5) The parental rights of the parent have been involuntarily terminated with respect to a child of the parent.

42 Pa.C.S.A. § 6302, **Definitions**.

5. This is likely to be the strategy frequently employed by parent advocates to defeat the impact of the Adoption and Safe Families Act (ASFA) on future dependency cases involving a parent who has failed to achieve reunification goals.

¶ 18 The mother, both here and in *A.J.B.*, charged that the reason OCY refused to agree to the consent to voluntary relinquishment was to establish or preserve the right of OCY to proceed toward involuntary termination by establishing aggravated circumstances, so as to expedite future termination proceedings should other children be born of the derelict mother(s) or should a second child become the subject of a dependency proceeding. This is not an improper or impermissible motive, and the coin has two sides in that mother, in attempting to obtain consent for a voluntary relinquishment, seeks to forestall that eventuality. Neither mother nor the agency has the control over the process that they believe they would have by obtaining a ruling from the court in their favor. In the final analysis, only the court can determine the efficacy of either of the petitions, and finding in favor of one excludes the other. Upon appellate review of that decision, this Court would exercise its function, as stated above, to determine if the decision was free of legal error and the credibility determinations and factual findings are supported by the record.

¶ 19 First, it is rare that a court would improperly exercise its discretion and deny an agency the legal right to obtain an Order terminating parental rights *after* it presented clear and convincing evidence that the health and welfare of the child required it. Such would be an abuse of discretion. To permit an Order of voluntary relinquishment after sufficient evidence for a decree of involuntary termination is presented and the reasonable effort requirements are met would be incongruous and contrary to the federal and state policy of minimizing the "foster care drift" that has doomed millions of children to interim, multiple or otherwise impermanent placement. The

criterion of aggravated circumstances is merely a step beyond the concept of prognostic deprivation, a due process expedient that permitted OCY, based on a family history of serious abuse or previously exhibited failure of parenting, to obtain custody of a child at birth before any actual abuse could occur. *See In re DeSavage*, 241 Pa.Super. 174, 360 A.2d 237 (1976) (*reversed and remanded on other grounds* ). The aggravated circumstances provision mandated by the ASFA advanced the process by requiring the court, after hearing and finding the existence of aggravated circumstances, which among other prior legal determinations included involuntary termination of parental rights, to directly order termination of parental rights and change the goal to adoption. *This, however, could not be done absent a dependency hearing, and establishing clear and convincing evidence of dependency, and a full review of the applicability of the reasonable efforts requirement; then upon a determination based on all of the evidence, including any aggravated circumstances such as involuntary termination, a finding could be made that further efforts at rehabilitation would be to no avail.* See 42 Pa.C.S.A. § 6334, **Petition** (b), and § 6351, **Disposition of dependent child,** (e) **Permanency hearing**.

¶ 20 In these proceedings, the parent and child are afforded the full due process rights they have under the Juvenile Act, ASFA and the Adoption Assistance and Child Welfare Act (AACWA), 42 U.S.C. §§ 620 *et seq.* Pennsylvania is required to implement the ASFA into its Juvenile Act and child welfare and adoption laws in order to receive federal funds (which are substantial), pursuant to the AACWA. *See In re R.T.*, 778 A.2d 670 (Pa.Super.2001), *appeal denied,* 568 Pa. 618, 792

A.2d 1254 (2001).[6]

¶ 21 While voluntary relinquishment was proper and accepted with consent of OCY prior to the effective dates of the ASFA, *see In re R.T., supra* (Retroactive effect is not given to aggravated circumstances which occurred prior to the date of the Act.), following the effective date of the ASFA, the court is required to give consideration to the aggravated circumstances provisions in the Juvenile Act, and the OCY need not consent to voluntary relinquishment, as to do so would defeat the purpose of the ASFA mandated provisions. The consent to relinquish pursuant to the Adoption Act, 23 Pa.C.S.A. § 2501, **Relinquishment to agency**, was not intended to be a substitute for involuntary termination of parental rights, but was intended for the purpose of relinquishment in the first instance to an adoption agency or, pursuant to section 2502, **Relinquishment to adult intending to adopt a child,** to free children for adoption under benign circumstances. Chapter 25 concerns "proceedings prior to petitions to adopt" and is so titled. Subchapter A, titled "Voluntary Relinquishment", is distinguished from Subchapter B, "Involuntary Termination", indicating the statutory intent to treat the matters separately.

**6.** As recognized in *In re R.T.,* 778 A.2d 670 n. 4 (Pa.Super.2001), *appeal denied,* 568 Pa. 618, 792 A.2d 1254 (2001), 42 U.S.C.S. § 671(a) mandates that the states adopt the policies and procedures set forth in the ASFA to be eligible for federal foster care and adoption assistance. In conjunction with the Adoption Act, *supra,* the Juvenile Act, 42 Pa.C.S.A. § 6334, *Petition* (b) **Aggravated Circumstances**, provides conformity with the ASFA.

(1) An allegation that aggravated circumstances exist may be brought:

(i) in a petition for dependency with regard to a child who is alleged to be a dependent child; or

(ii) in a petition for a permanency hearing with regard to a child who has been determined to be a dependent child.

(2) The existence of aggravated circumstances may be alleged by the county agency or the child's attorney. If the county agency reasonably believes that aggravated circumstances exist, *it shall file the appropriate petition as soon as possible but no later than 21 days from the determination by the county agency that aggravated circumstances exist.*

(Emphasis added.) In subsequent proceedings, section 6351, **Disposition of dependent child**, provides:

(a) **General Rule.**—If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the protection and physical, mental and moral welfare of the child:

. . .

(e) **Permanency hearings.**—

(1) The court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) *If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child has been adjudicated dependent, the court shall then determine if aggravated circumstances exist.* If the court finds from clear and convincing evidence that aggravated circumstances exist, *the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as provided in paragraph (3).*

(3) The court shall conduct permanency hearings as follows:

(ii) Within 30 days of:

. . .

(B) *a permanency hearing at which the court determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the home or to preserve and reunify the family need not be made or continue to be made* and the permanency plan for the child is incomplete or inconsistent with the court's determination[.]

(Emphasis added.)

¶ 22 Voluntary relinquishment deals with the routine relinquishment of newborn infants and/or orphans by persons who believe they are unable, mentally or physically, to deal with the rigors of raising a child.[7] This has been the case since 1925, the beginning of legislation permitting adoptions. What is significant about the process detailed above is that the courts in *A.J.B.*, in utilizing the authority of *In re Hess* to establish a reasonableness standard to permit parents to relinquish parental rights, ignored the bifurcated nature of the adoption process, which is divided into Chapter 25, **Proceedings prior to petition to adopt**, Chapter 27, **Petition for adoption**, and Chapter 29, **Decrees and records**. *Hess* is inapplicable to *A.J.B.* and the case before us because *Hess* was a proceeding *following* termination of parental rights and was pursuant to a petition to adopt, with the grandparents filing a petition to intervene. *See discussion supra.* Here we are not concerned with the reasonableness test · applicable in *Hess*, but rather the sole issue before us is whether the evidence presented by the child welfare agency established the statutory requirements for termination of parental rights by clear and convincing evidence. *See In Interest of the Coast, supra.* In *Coast*, our Court en banc stated: *"The power of the juvenile court is not to adjudicate what is for the best interests of a child, but to adjudicate whether or not the child is neglected."* *Id.* at 769, *quoting In Re Rinker*, 180 Pa.Super. 143, 117 A.2d 780, 783–784 (1955) (emphasis in original). *See also In Interest of T.M.*, 456 Pa.Super. 140, 689 A.2d 954 (1997).

¶ 23 This is the issue presented herein as well as to the Court in *A.J.B.*, and in each case, following dispositional hearings, the child was adjudicated dependent and, upon a finding of clear necessity, placed in the custody of the agency which had placed the child in a foster home. The process and time line detailed above in each case led to the final permanency hearing and goal change mandated by section 6351 of the Juvenile Act. *Presumptively, the permanency planning mandate in this matter had evolved beyond the point when voluntary relinquishment could stop the hearing for involuntary termination of parental rights.* At best, the voluntary relinquishment was an admission that involuntary termination was legally justified much as a guilty plea in criminal court, upon a showing of the factual basis on the record, establishes the grounds for a conviction. Admittedly the involuntary termination Decree would have implications as to the parents' fitness in future proceedings with OCY and juvenile court, and to *hold the parents accountable for their previous conduct in order to provide a greater degree of safety, protection and overall stability for the children of irredeemable parents.* See footnote 6 *supra.* To permit parents to escape this accountability at the moment of a judicial determination of involuntary

---

7. The consent of the agency to voluntary relinquishment is meant to apply in circumstances (1) when the child and family relationship has not reached the point requiring involuntary termination of parental rights; (2) where private adoption is decided upon by parents through an agency, private or public, requiring agency consent; (3) particularly in cases where subsidized adoptions and adoption assistance are in order to enable state funding; and (4) in cases where a disinterest-ed parent would desire to relinquish parental rights to effect a stepparent adoption or to avoid further parental involvement when involuntary termination was in the offing for the other parent. *See C.B. ex rel. R.R.M. v. Commonwealth of Pennsylvania*, 567 Pa. 141, 786 A.2d 176 (2001) (relating to adoption assistance subsidies, Pennsylvania's Adoption Opportunities Act, 62 P.S. § 772–74, and the federal AACWA, 42 U.S.C. § 670–76.

termination, by presenting a petition for voluntary relinquishment, is akin to entering a *nolo contendere* plea in criminal court, hoping thereby to vitiate the ability of the court to classify the defendant as an habitual offender in future convictions, thus destroying the entire effect of an elaborately designed sentencing scheme. This cannot happen in criminal court and it should not happen in orphans' court in termination and child welfare proceedings.

¶ 24 It is imperative to note that prior to the filing of the petitions and up until the termination proceeding, extensive legal and social work, child welfare and court resources and time already had been expended, and sometimes initiated years *before* the termination proceeding.[8] Filing of dependency petitions,[9] hearings in juvenile court,[10] adjudication of the adoptees as dependent children,[11] and following dispositional hearings,[12] permanency hearings,[13] involuntary termination petitions[14] precede hearings scheduled on those petitions. In accordance with the standard mandated by *Santosky, supra*, a full panoply of due process rights were accorded in *all the proceedings* and *at all stages*, beginning with the presumption that a parent's interest in his or her child is a fundamental liberty interest in the care, custody and management of the child, and does not evaporate simply because they have not been model parents and/or have lost temporary custody of their child to the state. *Santosky, supra* at 753, 102 S.Ct. at 1394–1395, 71 L.Ed.2d at 606.

¶ 25 In keeping with this mandate, it is the duty of the state to preserve the unity of the family. The state's interest in finding an alternative home for the child, therefore, arises only when it is clear that the natural parents cannot or will not provide sufficient care for the child. *Id.* at 766–767, 102 S.Ct. at 1401–1402, 71 L.Ed.2d at 615. The parental interest is so fundamental that a strict scrutiny standard of review is required to make a finding terminating parental rights, and due process requires that the party seeking termination must demonstrate by clear and convincing evidence that the parents can no longer perform parental duties and thus are not entitled to parental rights. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

¶ 26 Here, where there has been full compliance with the above due process mandate, it is illogical and improper to derail that process and deny the added protection given to the children through the ASFA. This issue, while newly raised in Pennsylvania, has been thoroughly reviewed by the Court of Appeals in Indiana in *In the Matter of G.B.*, 754 N.E.2d 1027 (Ind.Ct.App.2001). There, the court explained:

> In 1980, Congress enacted the Adoption Assistance and Child Welfare Act. See 42 U.S.C. §§ 620–628(b), 670–679(b). The Act authorizes federal subsidies to the States for the operation of their child welfare programs, but conditions that funding on certain requirements. *Phelps v. Sybinsky*, 736 N.E.2d 809, 813 (Ind.Ct.App.2000), trans. denied. The case before us arises from a 1997

---

8. 42 Pa.C.S.A. § 6321, **Commencement of proceedings.**

9. *Id.*, § 6334, **Petition.**

10. *Id.*, § 6335, **Release or holding of hearing.**

11. *Id.*, § 6341, **Adjudication.**

12. *Id.*, § 6351, **Disposition of dependent child.**

13. *Id.*, § 6351(e), **Permanency hearings.**

14. 23 Pa.C.S.A. § 2512, **Petition for involuntary termination.**

amendment to the Act that provides in pertinent part as follows:

In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which ... (15) provides that ... (D) reasonable efforts of the type described in subparagraph (B) shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that ... (iii) the parental rights of the parent to a sibling have been terminated involuntarily.

42 U.S.C. § 671.[2]

2 The legislative history of the Act provides in pertinent part as follows:

*There seems to be a growing belief that Federal statutes, the social work profession, and the courts sometimes err on the side of protecting the rights of parents. As a result too many children are subjected to long spells of foster care or are returned to families who reabuse them.*

The bipartisan group that wrote this legislation recognized the importance and essential fairness of the reasonable efforts criterion. What is needed is not a wholesale reversal of reasonable efforts or of the view that government has a responsibility to help troubled families solve the problems that lead to child abuse or neglect.... *Rather than abandoning the Federal policy of helping troubled families, what is needed is a measured response to allow States to adjust their statutes and practices so that in some circumstances States will be able to move more efficiently toward terminating parental rights and placing children for adoption.*

*Thus, the Committee bill would require States to define "aggravated circumstances," such as ... chronic abuse, or sexual abuse, in which States are allowed to bypass the Federal reasonable efforts criteria and instead would be required to make efforts to place the child for adoption. In addition, States would be required to bypass reasonable efforts to provide services to families if the parent ... has another child for whom parental rights were involuntarily terminated.*

House Report No. 105–77[, 105th Cong. 1st Sess. at p. 8, 1997 U.S.Code Cong. & Admin.News at pp. 2739–2740], April 28, 1997,

Cong. Record Vol. 143 (1997), "Purpose and Scope," page 8.

*Id.* at 1030 (emphasis added).

¶ 27 As indicated above, a petition by a parent for voluntary relinquishment was not intended to be used as a means to defeat the application of federally mandated statutes, as incorporated into state law under the AACWA and the ASFA. Even so, a proceeding to terminate parental rights is necessary before adoption proceedings can commence.

■ ¶ 28 A salient concept that was not considered in *A.J.B.* is that once a child is found dependent, the child's removal is established by clear necessity, and the child is removed from the custody of his parents, the primary right of the parents to custody of their child is converted to the state's duty to provide for the best interest of the child. The best interest of the child shifts away from the parents natural rights to primary concern for the child. The state has an independent interest in having the child become a productive law-abiding member of society. *In re Adoption of A.N.D.*, 360 Pa.Super. 157, 520 A.2d 31 (1986), *appeal denied,* 516 Pa. 638, 533 A.2d 710 (1987).

■ ¶ 29 In summation, once the agency in an involuntary termination proceeding establishes that the elements of abuse, abandonment and/or neglect have been proven by clear and convincing evidence, the child has not been reunited by reasonable efforts and time, and/or aggravated circumstances of a previous effort with the family establish sufficient bases for termination, the agency will prevail. Discretion always remains with the court in the course of a hearing to determine whether the elements of the proceeding have been established by clear and convincing evidence. The best interest of the child may not be separately considered by the court until a finding has been made

that the statutory requirements for termination have been met. *Coast, supra.* Because the A.J.B. lower court bypassed a hearing on involuntary termination, this Court in *A.J.B.* considered voluntary relinquishment to be in the child's best interest, rather than considering the health, safety and welfare of the child as required by statute.

¶ 30 Finally, for the following reasons, *A.J.B.* and the matter before us are distinguishable, and *A.J.B.* is not a precedent for the decision made by the orphans' court or our review here. In making his finding to terminate parental rights pursuant to the petition filed by OCY, Erie County President Judge William Cunningham conducted a hearing on both the petition of the mother for voluntary relinquishment and the petition for involuntary termination filed by OCY. In *A.J.B.*, the court *did not* hear the termination evidence but simply granted the mother's petition for voluntary relinquishment.[15]

¶ 31 With dramatic changes in federal and state law and regulations following passage of and recent amendments to the ASFA, however, a higher accountability has been placed on the long-term behavior of parents in relation to their children. The concept of permanency planning has increased focus on the child's well-being and, by creating the additional determina-

tion of aggravated circumstances, looks to the general welfare and best interest of the child or unborn children in dependency cases of parents who have demonstrated unfitness and inability to parent in their prior appearances in dependency proceedings.

¶ 32 The result in either case might be the same when it came to the adoption of the two children then under consideration, *but consequences as to the mother and the procedure to be followed in future dependency cases involving the mother and other children she bore would be radically different by circumventing federal and state provisions enacted to expedite termination and adoption proceedings for children of parents already proven to be unfit.* Contrary to the finding of the orphans' court and this Court in *A.J.B.*, that involuntary termination was self-serving on the part of the agency, the voluntary relinquishment, in negating the involuntary termination procedure, would give the unfit parent another bite at the apple or a fourth strike, when the record established aggravated circumstances which might permit the court, following a dependency hearing and adjudication, to bypass the reasonable efforts requirement and the mandated permanency planning hearings. The best interest of future children would be sacrificed to the whim of the unfit parent. The trial judge in this case specifical-

---

**15.** The crucial agency consent to a voluntary relinquishment is necessary as most voluntary relinquishments do not entail serious default by a parent proven incompetent to parent, and the agency must agree to assume custody of the child (see 23 Pa.C.S. 2501(b)), whereas involuntary termination is based on parental failure and inadequacy and must be pursued to serve the needs and welfare of the child who already is in agency custody. Agency consent is most often utilized in private adoption through private agencies and in situations pursuant to the AACWA, 42 U.S.C. § 670–76, and the Pennsylvania Adoption Opportunities Act, 62 P.S. § 771–741; *See C.B.*

*ex rel. R.R.M. v. Commonwealth, supra,* (regarding necessity of implementing adoption subsidies for handicapped adoptees). *It is a basic recognition that a child must at all times be in the legal custody of a responsible person or agency.* The least the court would be required to do when both petitions are presented is to determine which is most appropriate under the given circumstances. At that stage it is not reviewed as a question of best interest, but whether an agency will assume custody (section 2501(c) Consent), which is not at issue here, or whether involuntary termination can be established to bring about the change of goal to adoption.

ly found that the aggravated circumstance was an important consideration in ruling on the efficacy of an involuntary termination decree.

¶ 33 The argument presented by this Court in *A.J.B.*, that to refuse the voluntary relinquishment by a parent is contrary to public policy and might result in impediments to voluntary relinquishment, ignores the fact that voluntary relinquishment in these cases (as opposed to the more usual voluntary relinquishment case) occurs only *after* the total failure of the parent to perform and only at the time when involuntary termination is pursued. In cases like this one, the parent's petition is self-serving and is an attempt to avoid a future accelerated termination procedure after it has been established he or she is an unfit parent. The *A.J.B.* Court comes down entirely on the side of the unfit parent and ignores the consequences which the federal and state aggravated circumstances provisions seek to avoid and eliminate (precisely as the congressional committee criticized) *see Matter of G.B., supra.* That is to say, the *A.J.B.* Court sanctions the continued placement of at-risk children with unfit parents, while the juvenile court and child welfare agency are required to waste time attempting expensive and useless reasonable efforts at reunification. To the contrary, if the parent was aware that failing to fulfill reasonable efforts requirements in a timely fashion would ultimately result in involuntary termination of parental rights with consequences that would impact on future OCY and juvenile court proceedings, it is likely parents would voluntarily relinquish parental rights *before* a decision was reached to consider involuntary termination, or before permanent placement occurred. To deny a hearing on the involuntary termination petition is to provide a peremptory strike against a finding of aggravated circumstances at the time a voluntary relinquishment petition was filed.

■■■ ¶ 34 The legislative and judicial parameters of this proceeding have been clearly stated in *Lilley, supra,* which predated *A.J.B.* by four years. *Lilley* provided a definitive analysis of the mandate of the ASFA. The ASFA establishes unequivocally that goals for children in the child welfare system are *safety, permanency* and *well being.*

- The child's safety is the paramount concern. All decisions made must be based on the child's safety and well-being.
- Substitute care is a temporary setting. It *is not a place for children to grow up.* For children who cannot safely return home, the law provides for an expedited process to find these children permanent homes.
- Permanency planning for children begins as soon as the child enters substitute care. . . .
- The practice of *concurrent planning* is encouraged by ASFA. . . .

*Id.* at 334 n. 5. Thus, the initiation and implementation of the aggravated circumstances provisions and the harm of bypassing this provision by permitting voluntary relinquishment to avoid its implementation by sidestepping involuntary termination is crystal clear. As indicated in footnote 6, *supra,* it is also imperative to consider that 42 U.S.C.S. § 671(a) mandates that the states adopt the policies and procedures set forth in the ASFA to be eligible for federal foster care and adoption assistance.

¶ 35 Since the *A.J.B.* orphans' court did not take evidence or consider the merit of OCY's petition for involuntary termination, it presented to future courts a precedent that a petition for voluntary relinquishment foreclosed consideration of a petition for involuntary termination. As discussed

above, these petitions are mutually exclusive but must each be given its legal and evidentiary consideration and weighed in relation to the provisions of the Juvenile Act, the Adoption Act and the Federal ASFA and its state counterparts. To avoid the problem, the court in *A.J.B.* was empowered to remand the case to the orphans' court to take evidence and review the law as it related to the petition for involuntary termination. Since that procedure was not followed, we can only speculate as to the outcome of *A.J.B.* on appeal if this Court had the opportunity for a review of the matters on both petitions. Since in this matter this Court has the benefit of the record and findings of the orphans' court on both petitions, we stand in a dramatically different position than the Court in *A.J.B.*, and this case, therefore, is clearly distinguishable from *A.J.B.*

¶ 36 Following are the findings of the orphans' court in this case based on the evidence, records and testimony by OCY on its petition for involuntary termination of the parental rights as to A.M.B.

. . .

2. [A.M.B.] (the child) was born on February 2, 2000, in Erie, Pennsylvania. The child was adjudicated dependent on February 24, 2000 *after being detained at birth.* The child is presently in a pre-adoptive home.

3. The mother of the child is [J.B.], born May 26, 1981. In 1999, [J.B.] *voluntarily relinquished her parental rights to her first child.*

4. On March 3, 2000, a dispositional hearing was held at which time continued placement was authorized. Further, the mother was Court–Ordered to participate in weekly visits with the child, work with Dr. Leone to control her seizures, attend parenting classes, obtain a mental health assessment, participate in a bonding assessment, continue counseling through Family Services, participate in an NCAST assessment and adhere to all recommendations resulting from said assessments.

5. At a permanency hearing held on September 14, 2000, it was determined the mother had not complied with the treatment plan. Thereafter, the mother was ordered to work with Dr. Boehm at Stairways, take medication as prescribed, attend depression group counseling, submit to a drug and alcohol assessment, seek a psychiatric assessment and acquire suitable housing through HANDS.

6. The mother was terminated from counseling at Family Services for failure to comply. In addition, the mother failed to regularly attend parenting classes, depression group sessions and to keep her appointments with Dr. Leone. The mother refused to cooperate in a psychological treatment plan following her assessment. Also, the mother failed to follow through with the HANDS agency to secure suitable housing for the child. Instead, the mother took up residence with a paramour who has a criminal history.

7. On March 6, 2001, the Agency was authorized to proceed to an involuntary termination of the mother's parental rights.

8. The mother filed a Petition to voluntarily relinquish her parental rights to the child after realizing it was in the child's best interests to make the child available for adoption. The Petition was denied however, based on the Agency's refusal to consent.

9. The evidence presented at trial is uncontroverted. The mother has a

longstanding history of mental and physical health problems. She has been diagnosed with Oppositional Defiant Disorder and often suffers severe epileptic seizures which frequently cause her to lose consciousness.

10. Further, the mother lacks the mental capacity to properly care for the child. The mother also lacks the necessary parenting skills and is unwilling to attend parenting classes. Further, her limited intellectual abilities significantly impair her ability to develop basic parenting skills.

11. In addition, the mother does not have the necessary coping skills to deal with the stresses of daily life, including those stresses related to parenting a child. The mother is in a constant state of depression that causes her to require excessive amounts of sleep which renders her unable to care for the child.

12. The child is currently in a pre-adoptive home where the child's needs are being met. The pre-adoptive home consists of a married couple and six children. The house is adequate in size and their income sufficient to provide for the child's needs. The child is blossoming in this environment.

Orphans' Court Opinion, Cunningham, P.J., 8/16/2001 (emphasis added).

¶ 37 Beyond question the evidence is clear and convincing that parental rights should be terminated. Moreover, in view of the mandated change in the law, effective January 1, 1999, the agency need not consent to the previous alternative of voluntary relinquishment, so that the juvenile court will have the option *in addition to the reasonable efforts requirement, see* 42 Pa.C.S.A. § 6351(e)(2), *supra,* to bypass reasonable efforts and proceed to involuntary termination and a petition for adoption involving future dependency cases as to the parent. In keeping with the broad finding in *C.B. ex rel. R.R.M., supra,* the federal mandate does not preempt state law as to consent and does not require a finding that the consent provision conflicts with the federal statute and is, therefore, preempted. Where the reasonable effort requirements have been fulfilled and permanent placement is deemed necessary, voluntary relinquishment is redundant and a finding of involuntary termination having to do with parental fitness, rather than the best interest of the child, is a consistent and viable finding under both federal and Pennsylvania statutes. Here, involuntary termination is particularly appropriate since to require agency consent to the mother's voluntary relinquishment would result in a second child being relinquished by her. In the event this mother gives birth to another child, the reasonable efforts requirement would again apply with no opportunity to immediately proceed to adoption planning pursuant to aggravated circumstances mandates of the ASFA. There could be no benefit to the mother and extreme detriment to the child under that situation. A child's life, happiness and vitality simply cannot be put on hold until the parent finds it convenient to perform parental duties. *See Adoption of McCray,* 460 Pa. 210, 331 A.2d 652 (1975), *In re D.J.S.,* 737 A.2d 283 (Pa.Super.1999).

¶ 38 Based upon the foregoing, we affirm the Decree of the Honorable William P. Cunningham, which involuntarily terminated the parental rights of J.B.

¶ 39 Decree affirmed.

¶ 40 Dissenting Statement by MUSMANNO, J.

MUSMANNO, J., Dissenting.

¶ 1 I cannot join the majority's conclusion that the Orphans' court did not err when it involuntarily terminated Mother's parental rights rather than permitting Mother to voluntarily relinquish her parental rights. I believe that we are bound by our prior holding in *In re Adoption of A.J.B.*, 797 A.2d 264, 2002 PA Super 67, ¶ 5 (2002). In *Adoption of A.J.B.*, this Court addressed a similar situation involving OCY's refusal to consent to a voluntary relinquishment petition, and concluded that the Orphans' court properly denied OCY's motion to dismiss mother's voluntary relinquishment petition because OCY had implicitly consented to accept custody of the child.

¶ 2 Therefore, I am constrained to conclude that the trial court erred when it involuntarily terminated Mother's parental rights. On the authority of *Adoption of A.J.B.*, I would reverse the September 14, 2001 Order and remand this matter for the Orphans' Court to enter an order granting Mother's Petition to voluntarily relinquish her parental rights.[16]

**16.** We recognize that the Orphans' court judge did not have the benefit of our decision rendered in *Adoption of A.J.B.*