J-S48031-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: X.A.Z.V., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.B., MOTHER | : : : : : : : | |
| | : | No. 644 EDA 2018 |

Appeal from the Decree Entered January 25, 2018
in the Court of Common Pleas of Philadelphia County
Family Court at Nos:  51-FN-00320-2017
CP-51-AP-0000837-2017

BEFORE:   DUBOW, J., MURRAY, J., and PLATT*, J.

MEMORANDUM BY PLATT, J.:                    **FILED SEPTEMBER 17, 2018**

C.B. ("Mother") appeals from the decree entered on January 25, 2018, in the Court of Common Pleas of Philadelphia County, which granted the petition of the Philadelphia Department of Human Services ("DHS") and involuntarily terminated her parental rights to her minor daughter, X.A.Z.V. ("Child"), born in December 2016, pursuant to Section 2511(a)(1), (2), (5), and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511, and changed the permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[1]  After careful review, we affirm.

_____

[1] The parental rights of R.B. ("Father") were terminated on April 19, 2018. Father is not a party to this appeal and has not filed his own appeal. Additionally, we note that Mother does not challenge the goal change, and has thus waived it for purposes of appeal.  ***See Krebs v. United Refining Co. of Pennsylvania***, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that failure to

_____

*   Retired Senior Judge assigned to the Superior Court.

We adopt the following factual and procedural history from DHS'
statement of facts, as it was stipulated to by both parties and entered into
evidence. (**See** DHS Statement of Facts, at 1-4). DHS became involved with
the family in February 2017, after receiving a Child Protective Services ("CPS")
report that alleged a history of domestic violence between Father and Mother.[2]
The report alleged that during a domestic dispute, Father punched Mother in
the face and tried to remove Child from Mother's arms. Father attempted to
remove Child from the home without appropriate clothing, and the police were
contacted. Following the incident, Mother did not obtain a Protection From
Abuse ("PFA") order pursuant to 23 Pa.C.S.A. §§ 6101-6122, and allowed
Father to return to the home.

On February 7, 2017, DHS visited the family at maternal grandmother
("Grandmother's") home, where Mother was uncooperative and refused to
allow them entry. Grandmother let DHS into the home and confirmed the CPS
report allegations, and additionally stated that Father was in the home, that
domestic violence was ongoing between Father and Mother, and that she did

---

preserve issues by raising them both in concise statement of errors
complained of on appeal and statement of questions involved portion of the
brief on appeal results in waiver of those issues).

[2] The report also indicated that Mother suffered from an unspecified mental
illness, for which she was receiving treatment. The record does not reveal the
mental illness from which Mother allegedly suffered, nor does it indicate
whether Mother continued to receive appropriate treatment, or whether she
was noncompliant.

not feel safe in the home. Father came downstairs, but was hostile towards DHS and stated he would not allow them to take Child. Mother spoke with DHS and stated that Father had never harmed Child or her sibling, N.B.[3] DHS obtained an order of protective custody ("OPC") and removed Child and N.B. from the home. Mother and Father were escorted from the home by the police.

On February 10, 2017, the court convened a shelter care hearing. The OPC was lifted and Child's temporary commitment to DHS was ordered to stand. A stay-away order was issued against both parents as to Grandmother's home, but they were granted supervised visitation with Child at DHS.

On February 16, 2017, Child, who had initially been placed with Grandmother, was removed and placed in foster care. Parents' visitation was suspended based on a DHS report of aggressive behavior at a supervised visit and in the courtroom.

On March 9, 2017, Child was adjudicated dependent and fully committed to the custody of DHS. At that time, the court suspended the visitation of both parents until they were engaged in dual diagnosis treatment. Both parents were referred to Achieving Reunification Center ("ARC"). That same day, both parents attended a single case plan ("SCP") meeting. Mother's

_____

[3] The record provides no further details regarding N.B.'s age, biological father, or whether Mother's parental rights to N.B. also were terminated, either voluntarily or involuntarily.

objectives were to: (1) attend domestic violence victim counseling; (2) attend anger management; (3) develop coping skills to prevent violent outbursts; (4) attend and complete parenting classes; (5) comply with Community Umbrella Agency ("CUA") home assessments; (6) have contact with Child per court order at DHS for visitation; (7) sign all authorizations and consent forms; (8) confirm visits within twenty-four hours; (9) complete dual diagnosis evaluation and follow all recommendations; and (10) to submit to drug screening and three random drug screens in advance of the next court date.

Neither Mother nor Father reported to ARC, and their referrals were closed due to their non-participation. In April 2017, DHS attempted to conduct a home assessment. At first, Father refused to allow entry to the home. When the assessment was eventually conducted, the home was deemed inappropriate: both parents had a large quantity of marijuana in plain view, and they stated they would continue to use it.

On May 18, 2017, the court convened a permanency review hearing and determined that foster placement continued to be necessary and appropriate, and that neither parent was in compliance with a permanency plan for reunification. Both parents tested positive for cannabis and had not completed screening or a dual diagnosis assessment. Visits remained suspended until the parents were compliant and engaged in dual diagnosis treatment, and the court ordered them to engage with previously ordered services.

On August 17, 2017, the court convened a permanency review hearing and made the same determination regarding foster placement. Both parents

were in minimal compliance with the permanency plan, and had not engaged in drug and alcohol treatment, mental health treatment, or domestic violence counseling, and Mother twice tested positive for cannabis. Although both parents were attending parenting courses at ARC and Mother was attending anger management classes, CUA was forced to change the family's case manager due to safety concerns following interactions with both parents.[4] On August 21, 2017, DHS filed a petition seeking to terminate Mother's parental rights to Child and change her permanency goal to adoption.

In November 2017, the court convened a goal change/termination hearing. (*See* N.T. Hearing, 11/09/17, at 1). Mother and Father appeared, both represented by counsel. Child was represented by William Calandra, Esquire, as legal counsel, and by Alexandra Adams, Esquire, as guardian *ad litem*. (*See id.* at 2). Mother stipulated to the facts in DHS' petitions and the exhibits were admitted. (*See id.* at 20, 37-38). Braheem Powell, case manager for Turning Points for Children, testified that Child was in a confidential foster home, was receiving early intervention, and was being seen by a hematologist for a low white blood cell count. (*See id.* at 29-31). At the time of the hearing, Child had been in pre-adoptive foster care for eight months. (*See id.* at 31).

Father's counsel objected to going forward with the goal change because the case had only been open nine months and Father had not been properly

---

[4] The nature of these interactions was not apparent from the record.

served; Mother's counsel joined in the objection. (***See id.*** at 5). The hearing was continued so that an additional placement resource, a family friend, could be explored, and so that voluntary relinquishment forms could be prepared for both parents. (***See id.*** at 17-22). The court indicated that the forms should be generated by November 17, 2017, and that the parents would have until December 8, 2017, to sign them. (***See id.*** at 22).

On January 25, 2018, the court again convened a hearing regarding the petition as to Child. Mother appeared, represented by counsel. (***See*** N.T. Hearing, 1/25/18, at 1). Child was again represented by Attorney Calandra and Attorney Adams as legal counsel and GAL, respectively. (***See id.***). Counsel for DHS, Bennette Harrison, Esquire, indicated that her office had provided CUA with voluntary relinquishment forms on November 10, 2017. (***See id.*** at 3). Mario D'Adamo, Esquire, representing Mother, informed the court that Mother was willing to sign the relinquishments. (***See id.*** at 3-4). The court inquired as to why the forms were not signed when it had been attempting to call the case for three hours and that the "deadline" to sign the forms was in December 2017, and refused to allow Mother to sign. (***Id.*** at 4).

The court referenced the testimony of Mr. Powell at the November 2017 listing; Mr. Powell further indicated the Child would not be irreparably harmed by termination. (***See id.*** at 8-9). No additional testimony was taken. Both counsel for Child and the GAL joined DHS' petition seeking to terminate Mother's parental rights. (***See id.*** at 7). Mother's counsel did not object to the involuntary termination, but did reiterate that his client was willing to sign

the voluntary relinquishment. (*See id.* at 11). The court granted the petition pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b), and entered a decree involuntarily terminating Mother's parental rights. The court also entered an order changing Child's permanency goal to adoption.

On February 26, 2018, Mother contemporaneously filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[5] The court filed an opinion on May 4, 2018. *See* Pa.R.A.P. 1925(a)(2)(ii).

On appeal, Mother raises the following issues for our review:

1. Whether the trial court erred by disallowing Mother the opportunity to voluntarily relinquish her parental rights?

2. Whether the trial court erred by denying [Mother's] constitutional rights to voluntarily give up her parental rights under substantive due process analysis?[6]

(Mother's Brief, at unnumbered page 4) (unnecessary capitalization and answers omitted).

---

[5] Because the thirty-day appeal period from the trial court's January 25, 2018 order ended on Saturday, February 24, 2018, Mother had until Monday, February 26, 2018, to file her notice of appeal. *See* 1 Pa.C.S.A. § 1908; Pa.R.A.P. 903(a).

[6] Despite identifying a substantive due process analysis as an issue in her statement of questions, Mother does not develop this issue in her brief or cite any case law in support of it. Accordingly, she has waived this issue for purposes of appeal. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011), *appeal denied*, 24 A.3d 364 (Pa. 2011) (noting that appellate brief which fails to provide any discussion of claim with citation to relevant authority or fails to develop issue in meaningful fashion capable of review waives the claim); *see also* Pa.R.A.P. 2119(a)-(b).

We review cases involving the termination of parental rights according to the following standards.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Mother does not challenge the court's factual findings regarding the termination. (*See* Mother's Brief, at unnumbered pages 7-9). Instead, she argues that the court erred by refusing to allow her to voluntarily relinquish her parental rights. (*See id.* at 9). Due to the involuntary termination of her rights, Mother would be subject to a finding of aggravated circumstances as to any future children, relieving DHS from the burden of providing services in support of reunification. (*See id.*). She argues that "the time element was of no moment to the court[']s consideration[,]" and that it "had no bearing on whether Mother was willing or not willing to sign." (*Id.*).

Mother cites no specific case law in support of the proposition that the court was required to allow her to sign the voluntary relinquishment. (*See id.*). She cites generally to *In re A.J.B.*, 797 A.2d 264 (Pa. Super. 2002), in

which this Court affirmed the imposition of a reasonableness standard with respect to the agency's refusal to consent to mother's petition for voluntary relinquishment. (*See id.*); *see also A.J.B.*, *supra* at 267-69. In *A.J.B.*, this Court disapproved of the agency's refusal solely so that it could impose aggravated circumstances in the future. *See A.J.B.*, *supra* at 268 (noting public policy interest in dispensing with requirement of agency's consent to voluntary relinquishment and allowing parents to voluntarily relinquish their parental rights).

With regard to voluntary relinquishment, the Adoption Act provides, in pertinent part:

> When any child under the age of [eighteen] years has been in the care of an agency for a minimum period of three days or, whether or not the agency has the physical care of the child, the agency has received a written notice of the present intent to transfer to it custody of the child, executed by the parent, the parent or parents of the child may petition the court for permission to relinquish forever all parental rights and duties with respect to their child.

23 Pa.C.S.A. § 2501(a). "Typically, voluntary relinquishment is the mechanism utilized by parents who believe they are physically or mentally unable to raise a child and therefore wish to place the child for adoption." *In re J.F.*, 862 A.2d 1258, 1260 (Pa. Super. 2004).

Since *A.J.B.*, our Court has noted that an agency's refusal to consent to voluntary relinquishment in order to expedite future termination proceedings is not an improper or impermissible motive, and that only the trial court can determine the efficacy of either type of petition and find in favor of one

excluding the other. *See In re Adoption of A.M.B.*, 812 A.2d 659, 667 (Pa. Super. 2002) (noting that permitting an order of voluntary relinquishment after sufficient evidence for decree of involuntary termination is presented and reasonable effort requirements are met is incongruous and contrary to federal and state policy). Additionally, the agency's actions should be examined under a reasonableness standard. *See A.J.B.*, *supra* at 267-69. "Upon appellate review of that decision, this Court would exercise its function, as stated above, to determine if the decision was free of legal error and the credibility determinations and factual findings are supported by the record." *A.M.B.*, *supra* at 667.

Here, the trial court offered Mother the opportunity to sign the voluntary relinquishment and DHS consented, generating the voluntary relinquishment forms. Mother did not sign them within the time provided and, as of the final termination hearing, still had not signed them. Although there is no time requirement outlined in the statute, it is within the court's discretion to determine which petition—voluntary or involuntary—should be granted. *See id.*

*A.M.B.* provides two further salient considerations. First, that prior to the filing of the petitions and up to the termination considerations, the parent is afforded a full panoply of due process rights at all stages, including: "extensive legal and social work, child welfare and court resources and time already had been expended, and sometimes initiated years before the termination proceeding. Filing of dependency petitions, hearings in juvenile

court, adjudication of the adoptees as dependent children, and following dispositional hearings, permanency hearings, involuntary termination petitions . . . ." *Id.* at 670 (footnotes and emphasis omitted). Second, that where the agency presents sufficient evidence for a decree of involuntary termination, and the reasonable effort requirements are met, allowing a voluntary termination is contrary to policy. *See id.* at 667.

Here, the court determined that DHS had established by clear and convincing evidence the statutory grounds for termination. The court was not required, at that point, to allow Mother to relinquish her rights voluntarily. *See id.* Mother had proceeded through the previous stages of the process delineated above, and by the time the second termination hearing convened, Mother's due process rights had been satisfied. *See id.* Accordingly, we decline to find an abuse of discretion in the court's refusal to allow Mother to sign the voluntary relinquishment paperwork. *See id.*

Mother does not challenge the court's findings regarding 23 Pa.C.S.A. §§ 2511(a) and (b). Accordingly, she has waived these issues for purposes of appeal. *See Krebs*, *supra* at 797; *see also In re A.C.*, 991 A.2d 884, 897 (Pa. Super. 2010) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.") (citation omitted).

Decree affirmed.

- 11 -

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/17/18