J. S03015/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: M.L.S., A MINOR:  IN THE SUPERIOR COURT OF
                                       :              PENNSYLVANIA

APPEAL OF: S.S., MOTHER,        :

                                         :       No. 2516 EDA 2014
                 Appellant     :

Appeal from the Order Entered July 28, 2014,
in the Court of Common Pleas of Philadelphia County
Juvenile Division at Nos. CP-51-AP-0000340-2014,
CP-51-DP-0002222-2012

BEFORE: FORD ELLIOTT, P.J.E., PANELLA AND OTT, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED MARCH 27, 2015**

S.S. ("Mother") appeals from the order entered on July 28, 2014,[1] granting the petition filed by the Department of Human Services of Philadelphia County ("DHS") to involuntary terminate her parental rights to M.L.S. ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We affirm.

In May 2012, Child was born prematurely, at 25 weeks' gestation, at the Children's Hospital of Philadelphia ("CHOP"). (Notes of testimony, 7/28/14 at 13.) Child suffered from numerous medical problems as a result of her premature birth; namely, chronic lung disease; stage three inter-ventricular hemorrhaging and reflux; a need for oxygen support; and a

---

[1] The trial court also terminated the parental rights of K.Y., father, who did not file an appeal.

gastrointestinal tube ("G-tube") for feeding. (*See* Exhibit 1, General Protective Services ("GPS") report, dated 11/16/12 at 1.) Child remained at CHOP following her birth and was scheduled for discharge on November 20, 2012. (*Id.*) Prior to Child's discharge, Mother was required to do two 24-hour stays at CHOP to show that she was equipped to manage Child's medical care. (*Id.*)

During the first 24-hour stay, Mother slept through several alarms, including one for Child's oxygen tube. CHOP doctors and staff informed Mother that her behavior would need to be corrected before her next stay. (*Id.*) During Mother's second stay on November 15, 2012, she slept for 30 minutes through an alarm for Child's oxygen tube. As a result, the oxygen tube became clogged. (*Id.*) The GPS report also noted that during other visits with Child, a nurse had to wake Mother so she could care for Child. (*Id.*)

Because CHOP doctors and staff were concerned that Mother would sleep through alarms once Child was discharged from the hospital, DHS was notified and the GPS report was forwarded on November 16, 2012. Child's doctor wanted to meet with DHS to establish a discharge plan because Child was at high risk for readmission to CHOP if she were to leave the hospital. The report alleged that Mother was not prepared to care for Child in her home given that Child had special needs and required medication; there were concerns regarding Mother's mental health; Mother's insurance would

not cover adequate nursing support for her and Child; Mother did not have any baby items for Child or a suitable space for Child to sleep in her home; and Mother lacked other support to help her with Child and her other child who has a seizure disorder. (*Id.* at 1-2.)

According to the trial court, on November 28, 2012, DHS evaluated Mother's home and determined that Mother did not have the ability to give Child a suitable place to sleep or stay. (*See* trial court opinion, 10/8/14 at 2.) An order for protective custody was granted on December 13, 2012; Child left CHOP and entered foster care where she has remained in care continuously.

On January 9, 2013, the trial court determined Child was a dependent child and Child was committed to DHS's custody. A family service plan was developed and Mother's objectives were: to visit with Child; attend Child's medical appointments; attend parenting classes; and obtain mental health treatment and suitable housing. Drug treatment was also added as a Family Service Plan ("FSP") goal after Mother admitted she had been "doing drugs." Mother failed to complete any of her FSP goals. (Notes of testimony, 7/28/14 at 15-17.)

The trial court discussed the FSP goals and Mother's visits with Child as follows:

> Mother did not achieve all of her FSP objectives through the life of [the] case (N.T. 7/28/14, pgs. 15-16, 39). Mother was aware of her FSP objectives (N.T. 7/28/14, pg. 15). FSP meetings have been

held at regular intervals throughout the life of the case (N.T. 7/28/14, pg. 16). All the services were offered to help Mother reunify with her Child (N.T. 7/28/14, pgs. 31-33, 35-36). The record establishes that DHS provided and offered reasonable and adequate services to remedy the conditions that brought the Child into care. At one point, Mother was granted unsupervised visits with Child but Mother's visits were subsequently changed to supervised because of concerns about her care with Child during the visits (N.T. 7/28/14, pgs. 18-19). In particular[], it was unclear whether the Child was being fed during unsupervised visits with Mother, the Child would come back smelling of smoke, Child's G-tube was irritated and would not be flushed, the pulse oximeter was not being used and the oxygen machine was not connected (N.T. 7/28/14, pgs. 18-19). During Mother's unsupervised visits at the agency, when people walked by, Mother would be sleeping and Child would be asleep with the oxygen machine off (N.T. 7/28/14, pg. 19). Mother's visits were changed to supervised at the Permanency Review hearing on March 5, 2014. Thereafter, Mother never reached the point in which she could obtain unsupervised visitation and she was not consistent with her visitations (N.T. 7/28/14, pgs. 19-20). Additionally, Mother never obtained employment and adequate housing (N.T. 7/28/14, pgs. 28, 30). Mother has admitted that she has refused or failed to perform parental duties and that she is not able to provide for her child's appropriate care (N.T. 7/28/14, pgs. 39-40).

Trial court opinion, 10/8/14 at 4.

On June 30, 2014, Mother's goal was changed to adoption. On July 10, 2014, DHS filed a petition to terminate Mother's parental rights; and a hearing was held on July 28, 2014. At the end of the hearing, the trial court ordered Mother's parental rights terminated under Section 2511(a)(1),

(2), (5), (8), and (b). This timely appeal followed. Mother raises the following issues:

> 1. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] parental rights where DHS failed to prove by clear and convincing evidence that involuntar[ily] terminating [Mother's] parental rights would best serve the emotional needs and welfare of [Child]?
>
> 2. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating Mother's parental rights without fully considering the impact of termination on the emotional needs and welfare of [Child]?

Mother's brief at 3.

We review a decree terminating parental rights in accordance with the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super. 2009), quoting *In re S.H.*, 879 A.2d 802, 805 (Pa.Super. 2005), *appeal denied*, 892 A.2d 824 (Pa. 2005). The burden is upon the petitioner to prove by clear and convincing evidence

that its asserted grounds for seeking the termination of parental rights are valid. *Id.* Moreover, we have explained:

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.*, quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa.Super. 2003). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003). This court may affirm the trial court's termination of parental rights with regard to any one subsection of Section 2511. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

In *In re C.L.G.*, 956 A.2d 999 (Pa.Super. 2008) (*en banc*), this court instructed as follows:

> [O]ur case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only after determining that the parent's conduct warrants termination of his or her parental rights must the

court engage in the second part of the analysis: determination of the needs and welfare of the child under the standard of best interests of the child. Although a needs and welfare analysis is mandated by the statute, it is distinct from and not relevant to a determination of whether the parent's conduct justifies termination of parental rights under the statute. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child.

*Id.* at 1004 (citations omitted).

Mother does not challenge the sufficiency of the evidence with regard to Section 2511(a) to support the termination of her parental rights, only Section 2511(b). Thus, in reviewing the present appeal, as Mother has waived any challenge to the sufficiency of the evidence to support the termination under Section 2511(a), we focus on Section 2511(b), which provides, in relevant part, as follows.

**§ 2511. Grounds for involuntary termination**

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

In reviewing the evidence in support of termination under Section 2511(b), we consider whether the termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. **See In re C.M.S.**, 884 A.2d 1284, 1286-1287 (Pa.Super. 2005), **appeal denied**, 897 A.2d 1183 (Pa. 2006). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." **Id.** at 1287 (citation omitted). The court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child from permanently severing that bond. **Id.**

Mother argues that DHS failed to prove that termination of her parental rights best served Child's needs and welfare. To that end, she contends the effect of terminating the parent/child bond must be considered separately from the parent's capacity to care for the child. Mother maintains that DHS's evidence consisted primarily of her failure to meet her FSP goals. (Mother's brief at 12.)

In this case, Mother's FSP goals were established to help her reunify with her child who has special needs and requires medication as well as constant supervision. By failing to accomplish any of her goals, Mother has shown she is unable to provide for Child's needs and welfare. The record is

replete with instances of Mother's failure or inability to properly attend to Child's medical conditions.

Additionally, Mother's own testimony is certainly not helpful to her case. Mother elected to appear by telephone during the termination hearing. Mother was asked:

> [Mother's counsel]: Do you feel that you are, at this point, able to provide [Child] with appropriate care?
>
> Mother: No.
>
> [Mother's counsel]: You do not feel that you can provide her with appropriate care right now?
>
> Mother: No.
>
> [Mother's counsel]: Are you asking that she be returned to you?
>
> Mother: No.

Notes of testimony, 7/28/14 at 39-40.

This court has held that a child's life, happiness, and vitality cannot be put on hold until a parent finds it convenient to perform parental duties. ***In the Matter of the Adoption of A.M.B.***, 812 A.2d 659, 675 (Pa.Super. 2002). It is clear the record supports the trial court's conclusions that Mother is unable to properly care for Child, thus putting Child's welfare at risk. Hence, there is no merit to Mother's claim that DHS failed to prove that termination of her parental rights best served the needs and welfare of Child.

In her second issue, Mother argues DHS did not present clear and convincing evidence that Child's emotional needs and welfare would be best served by permanently severing her bond to Mother. Also, Mother claims the trial court made a cursory, inadequately supported finding that termination was in Child's best interests. We find the record belies Mother's arguments.

We begin by pointing out that Child has been in DHS's care her entire life.[2] At the time of the termination hearing, Child had been in a pre-adoptive foster home for 14 months. (Notes of testimony, 7/28/14 at 14-15.) Child refers to her foster mother as "mom." (*Id.* at 21.) According to DHS caseworker Sharronda Pointer, Child is "very bonded with [foster mom] and her whole entire family." (*Id.*) Mother was asked to describe her last visit with Child on May 22, 2014, and she responded: "When I saw [Child] she was happy to see me. We bonded. I played around with her and her toys." (*Id.* at 39.)

This court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond is attenuated. *See In re K.Z.S.*, 946 A.2d 753, 764 (Pa.Super. 2008). While Child has had visits with Mother, those visits do not support Mother's claim that a parental bond has

---

[2] At the time of the termination hearing, Child was approximately 26 months old.

been forged.[3]  Ms. Pointer and Ivy Lloyd from the Northeast Treatment Center, both testified that  they did not believe there was a maternal bond between Mother and Child, and Child would not suffer irreparable harm if Mother's parental rights were terminated.  (Notes of testimony, 7/28/14 at 20, 25-26.)  The trial court concluded "there is no parent/child bond" and the termination of Mother's parental rights would not cause irreparable harm to Child.  (Trial court opinion, 10/8/14 at 7.)[4]

Child's main sources of love, stability, and security derive from her foster mother, not Mother.  Moreover, Mother is unable to meet the Child's emotional, physical, and developmental needs, or to provide Child with a healthy and safe environment.  While Mother may have an attenuated bond with Child, it is of such a nature that its severance would not cause Child undue harm.  Accordingly, we discern no basis for disturbing the trial court's conclusion that termination of Mother's parental rights served the needs and welfare of Child.

Order affirmed.

---

[3] According to DHS, Mother missed 14 of 29 visits with Child for the period January 9, 2013 through June 25, 2013.  Mother continued to miss visits with Child after June of 2013 through May 22, 2014.  (DHS's brief at 17.)

[4] Mother attempts to minimize the evidence presented by DHS regarding the parent/child bond.  The cases Mother cites are inapposite.  Mother relies on cases where no evidence was presented regarding the parent/child bond.  Here, DHS presented witness testimony to demonstrate Mother did not have

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/27/2015

---

a bond with Child; Child had a bond with foster mother and her family; and Mother's behavior posed a risk of harm to Child.