J-S84021-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.A.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.A.K. A/K/A B.A.A. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1309 MDA 2017 |

Appeal from the Order Entered July 24, 2017
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s):  1081-2017

BEFORE:  SHOGAN, J., LAZARUS, J., and OTT, J.

MEMORANDUM BY LAZARUS, J.:                 **FILED FEBRUARY 26, 2018**

B.A.K. ("Mother") appeals from the order, entered in the Court of Common Pleas of Lancaster County, terminating her parental rights to her six-year-old son, D.A.A. ("D.") (DOB: May 2011).[1]  After our review, we affirm.

D. has been diagnosed with cerebral palsy and has severe medical needs; he lacks the reflex to suck or swallow, is fed through a gastro-intestinal tube, cannot regulate his body temperature, cannot speak, and is visually impaired.  D. also requires supplemental oxygen and suctioning due to excess mucus production.  As a result, D.'s medically fragile state requires continual supervision.

Lancaster County Children and Youth Social Service Agency (the "Agency") became aware of this family in 2011, having received reports

---

[1] The trial court terminated Father's parental rights as well.  **See** Order, 7/24/17.  Father is not a party to this appeal.

regarding Mother's substance abuse and reported overdose. While investigating a referral, police found Mother semiconscious on the floor next to D.'s crib while D. was in her care. D. was five months old at the time; he was covered in mucus because his feeding tube had not been suctioned. N.T. Termination Hearing, 7/24/17, at 8. The court, in the ensuing dependency action, noted Mother's drug and alcohol issues and noted the fact that Father provided only limited care for D.

The Agency has had custody of D. since April 17, 2015; D. was initially placed in the Agency's custody with Father's consent, while Mother was at an inpatient alcohol and drug abuse treatment center. On May 12, 2017, the Agency filed a petition to involuntarily terminate Mother's parental rights, and D. was adjudicated dependent. The court held a hearing on July 24, 2017 and, thereafter, terminated Mother's parental rights under sections 2511(a)(1), (a)(2), (a)(5), (a)(8) and (b) of the Adoption Act. 23 Pa.C.S. §§ 2511 *et seq*. Mother filed an appeal and presents three issues for our review:

1. Did the court err and abuse its discretion in terminating the parental rights of Mother in that Mother had addressed the specific concerns that led to placement of [D.] but the [Agency] insisted that Mother complete training to address the special needs of [D.], yet the Agency was unable to offer or refer said training to Mother?

2. Did the court err in sustaining an objection from Agency counsel that precluded Mother from testifying about the nursing care that Mother and Father had in place to meet the special needs of [D.] prior to the placement of D.]?

3. Did the court err and abuse its discretion in terminating the rights of [Mother] as termination of [Mother's] rights is not in the best interests of [D.] and will not promote the

> physical, mental, or emotional wellbeing of [D.], as the interaction between Mother and [D.] during visits demonstrates that a bond exists between Mother and [D.]?

Our standard of review is well settled:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence. It is clear that in a termination proceeding, the focus is on the conduct of the parents.

*In the Matter of B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (en banc) (citations omitted). "[W]e need only agree with [a trial court's] decision as to any one subsection [of 2511(a), along with 2511(b),] in order to affirm the termination of parental rights." *Id.* at 384.

At the permanency review hearings in September, 2015, October, 2015, and February, 2016, the court determined Mother's compliance with the permanency plan was minimal. Mother failed to complete her goals regarding her mental health and her drug and alcohol issues, failed to meet her goals of financial stability, housing, and parenting skills, and failed to show her commitment to D. In fact, following D.'s placement, Mother neglected to sign any release for mental health treatment or drug and alcohol treatment, and she moved to Florida to live with her parents. At the February 2016 hearing,

the court determined that Mother had one visit with D., in December 2015, since D.'s placement and that she kept in touch with the caseworker by phone.

Over one year after placement, at the permanency review hearing in July 2016, the Agency indicated that Mother had completed her mental health and drug and alcohol treatment requirements. However, she had no other visits with D. since the December 2015 visit, she continued to live in Florida, and she had not begun parenting classes.

At the August 2016 permanency review hearing, D. had been in the Agency's custody for sixteen months. The court found Mother's progress was "moderate," and that no termination petition would be filed until after an Interstate Custody Placement Compact (ICPC),[2] which had been submitted to the Agency's counterpart in Florida, was completed. The ICPC, which was submitted in June 2016, required a review of Mother's situation in Florida to evaluate Mother's environment and ensure that it was suitable for D.

On August 30, 2016, the court entered an order authorizing the Agency to consent to medical treatment for D., a tracheotomy, which would reduce D.'s need for oxygen treatments. Mother visited D. during D.'s hospitalization,

---

[2] **See** 62 P.S. § 761. The ICPC is an agreement among the states, the District of Columbia and the Virgin Islands to cooperate with each other in the interstate placement of children. **See id.**, at Article I ("(a) Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.").

and wanted to be trained in tracheotomy care. However, since D. was in placement with resource parents,[3] and the training session was limited to two people, the Agency decided that the best course was for both resource parents to attend. The Agency would provide the training for Mother if D. was to return to parents' care. **See** N.T. Termination Hearing, 7/24/17, at 30.

By the November 2016 permanency hearing, Mother had completed the mental health and drug and alcohol requirements; she continued to live with her parents in Florida and remained unemployed. Mother did visit D. during this review period. Notably, Mother visited Pennsylvania from September to December of 2015, but did not visit D. until December 2015. An ICPC was submitted in August 2016.

At the December 2016 permanency review hearing, the court found Mother's progress continued to be "minimal" and her compliance "moderate." Order, 12/2/16. The ICPC remained pending. At this point in time, D. had been in the custody of the Agency for twenty months.

In February 2017, the ICPC study was denied because Mother remained dependent upon her parents. **See** N.T. Termination Hearing, **supra** at 14-15. Additionally, the bedroom in Mother's parents' home was too small to accommodate D.'s medical equipment. During this review period, Mother had no visits with D., but she kept in touch with the caseworker by phone. The

---

[3] Resource parents have a biological child with similar medical issues as D. The court noted that their experience with their own child has "made them apt caregivers and advocates for D." N.T. Hearing, 7/24/17, at 24-25.

Agency sought a change of goal from reunification to adoption. The court deferred its decision on the change of goal.

At the May 2017 permanency hearing, the Agency again acknowledged that Mother had successfully completed her mental health and drug and alcohol requirements and continued to attend support meetings, but noted that she remained unemployed and continued to live with her parents in Florida. The Agency filed a petition to terminate parental rights on May 21, 2017. Mother moved back to Pennsylvania in June 2017.

A termination hearing was held on July 24, 2017.[4] Mother testified that she did all she needed to do, that she was "back here" and wanted her son back. N.T. Termination Hearing, *supra* at 55. She stated that she believed she could provide the care necessary for D. *Id.* at 56. She also testified that she was living in Ephrata with Father, and that she and Father had resolved their differences. However, Mother also testified that she is unemployed, that she unable to obtain employment "because of [her] arm[,]"[5] but has not attempted to receive any type of disability benefits. *Id.* at 60. On cross-examination, Mother acknowledged that financial stability was a part of the child permanency plan, *id.*, and further testified:

_____

[4] We note that D.'s guardian *ad litem* ("GAL") was present at the termination hearing, as well as D.'s court-appointed special advocate ("CASA"). *See* N.T. Termination Hearing, 7/24/17, at 4. The GAL did not file a separate brief on appeal, but incorporated the Agency's brief.

[5] Mother has some issue with her arm that was never clearly explained at the hearing.

- 6 -

Q: What is your plan should you and [Father] again not be getting along?

A: Hopefully that doesn't happen.

Q: But if it does happen, would you be able to get your housing?

A: Counseling, work it out.

Q: But where would you stay during that time?

A: I'm not sure. Like I said, I'm not looking into the future and that happening.

Q: You are aware that you were denied for the ICPC and that the agency could not place D. into your home in Florida, is that correct?

A: Yes.

Q: And that would have been in February 2017?

A: Yes.

Q: Why didn't you move back then when you found out the Agency could not place him in your care?

A: I don't know. I didn't want to then. I mean –

Q: But in June of 2017 you did want him to then be placed in your care when you moved back?

A: It's not that I didn't want him to be placed into my care. I wasn't really talking to [Father] that much at that time until after that, and then we decided to reconcile. But why would I be staying in Florida if I can't get my son down there?

Q: But you did stay there from February to June?

A: Yes.

**Id.** at 60-61.

At the conclusion of the hearing, the court terminated Mother's parental rights under sections (a)(1),[6] (a)(2),[7] (a)(5)[8] and (a)(8)[9].

Mother first argues that the court erred in finding that she had failed to address the specific concerns that led to D.'s placement; she points specifically to the Agency's insistence that she complete tracheotomy care training to address D.'s special needs, but its failure to offer or refer her to the training. Mother's argument misrepresents the facts.

---

[6] **See** 23 Pa.C.S. § 2511(a)(1) (parent by conduct continuing for period of at least six months immediately preceding filing of petition either has evidenced a settled purpose of relinquishing parental claim to child or has refused or failed to perform parental duties).

[7] **See** 23 Pa.CS. § 2511(a)(2) (repeated and continued incapacity, abuse, neglect or refusal of parent has caused child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and conditions and causes of incapacity, abuse, neglect or refusal cannot or will not be remedied by parent).

[8] **See** 23 Pa.C.S. § 2511(a)(5) (child has been removed from care of parent by court or under a voluntary agreement with agency for period of at least six months, conditions which led to removal or placement of child continue to exist, parent cannot or will not remedy conditions within reasonable period of time, the services or assistance reasonably available to parent are not likely to remedy conditions which led to removal or placement of child within reasonable period of time and termination of parental rights would best serve the needs and welfare of the child).

[9] **See** 23 Pa.C.S. § 2511(a)(8) (child has been removed from care of parent by court or under voluntary agreement with agency, 12 months or more have elapsed from date of removal or placement, conditions which led to removal or placement of child continue to exist and termination of parental rights would best serve the needs and welfare of child).

The hearing testimony indicated that training space was limited. The Agency determined that, at that time, the resource parents, who were providing D.'s daily care, would be trained. N.T. Termination Hearing, 7/24/17, at 25. In light of this fact, and the fact that at that time D. had been in placement for sixteen months and Mother had not visited D. for eight months, the Agency's decision was appropriate. Further, and most significantly, the Agency would provide the medical training if D. were returned to Mother. *Id*. at 30. Mother's argument overlooks this point. *Id.* at 30. Additionally, Mother acknowledged that she "never checked" into whether she could get the training in Florida. *Id*. at 52. Despite Mother's implication, the Agency did not jeopardize Mother's efforts in completing the child permanency plan. We find no error.[10]

Next, Mother argues the court erred in sustaining an objection precluding her testimony regarding nursing care she and Father had in place, prior to D.'s placement, to meet D.'s special needs. At the hearing, Mother testified on direct examination as follows:

Q: How old was [D.] when he was placed with the – with the Agency?

A: [A]lmost four.

Q: And you had treatment in place for him at that point in time, correct?

---

[10] We also point out that Mother's own testimony indicates that appropriate housing, another part of the child permanency plan, is presently dependent on her relationship with Father.

A: What do you mean by treatment?

Q: Nursing?

A: Nursing, yes; there was nursing care.

Q: Please describe for the Court what you had in place back then, 2015, as far as nursing care is concerned.

A: We had a night shift nurse and a day shift nurse, so coverage basically went from 11 o'clock in the evening until 3 o'clock the following afternoon, because one worked 11 a.m. – I mean 11 p.m. to 7 a.m, then it was 7 a.m. to 3 p.m.

Q: And what was – why was that treatment necessary? Why was that nursing care necessary?

A: Just to help take care of [D.]. . . They would help give him a bath, and they would suction him, and they'd help out when we went to doctors' appointments.

Q: Okay. This is all before he got the tracheostomy, correct?

A: Yes.

Q: How long did you and your husband have the nursing care in place?

A: Since [D.] was, I think six months old.

Q: How did you afford – okay, how did you afford to arrange that care?

N.T. Termination Hearing, 7/24/17, at 53-54. At this point, the Agency objected and the court sustained the objection. Mother argues that this testimony was relevant to the issue of neglect and her "economic situation." Appellant's Brief, at 15. This claim is meritless.

The court noted that the testimony addressed conditions prior to D.'s placement, and noted also that there was no dispute that nursing care was necessary. *Id*. at 55. First, we point out that, contrary to Mother's assertion,

the court *did* allow Mother to testify as to the provision of nursing care as it related to the issue of neglect. As the court stated, the fact that Mother could afford those services in 2015, and could possibly revive them, overlooks the fact that the neglect and placement occurred "*exactly when she had that help*." Trial Court Opinion, 9/21/17, at 18 (emphasis in original). Nursing care was, and is, but one component of D.'s special needs. We find no error or abuse of discretion.

Finally, Mother argues the court erred in terminating her parental rights because termination is not in D.'s best interests and will not promote his physical, mental or emotional wellbeing. Mother asserts that her visits demonstrated the bond between her and D.

This Court has long recognized that "[a] child's life, happiness and vitality simply cannot be put on hold until the parent finds it convenient to perform parental duties." ***In the Matter of the Adoption of A.M.B.***, 812 A.2d 659, 675 (Pa. Super. 2002). The paramount concern here is to ensure D.'s permanency, safety and wellbeing, giving primary consideration to D.'s developmental, physical and emotional needs and welfare. 23 Pa.C.S. 2511(b).

Our review of the record shows that D.'s health, attendance at medical appointments, education, appearance, and quality of life have improved since placement with his resource parents. The court-appointed special advocate testified at the hearing that she observed Mother's interactions with D. as well as the resource parents' interactions with D. Although she found Mother was

affectionate with D. and that she believed Mother loved D., she believed termination was in D.'s best interests. She based this on her "understanding that D.'s life really depends on attentive and active care for his health[.]" N.T. Termination Hearing, 7/24/17, at 42. The court found this testimony credible. Our standard of review requires us to accept the trial court's findings of fact and credibility determinations where, as here, they are supported by the record. *See B.L.W.*, *supra*.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/26/2018