J-A28045-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 918 MDA 2021 |

Appeal from the Decree Entered June 24, 2021
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s): 2021-00569

| | | |
|---|---|---|
| IN THE INT. OF: O.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 919 MDA 2021 |

Appeal from the Decree Entered June 24, 2021
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s): 2021-00570

BEFORE:   LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED:  DECEMBER 28, 2021**

In this consolidated appeal, E.K. ("Mother") challenges the decree entered in the Court of Common Pleas of Lebanon County, Orphan's Court Division, granting the petition of Lebanon County Children and Youth Services ("CYS") to involuntarily terminate her parental rights to her minor children

---

[*] Former Justice specially assigned to the Superior Court.

R.K. and O.K.[1]  At issue is whether the court abused its discretion during the involuntary termination hearing when it declined to conduct a hearing on Mother's voluntary termination petition initially offered to the court only after CYS had completed what the court found to be a compelling case for involuntary termination.  After careful review, we affirm.

The trial court aptly summarizes the pertinent facts and procedural history of the present matter, as follows:

> Appellant [E.K. (hereinafter "Mother")] has filed simultaneous, identical appeals relating to the termination of her parental rights to two of her children:  [R.K.] is docketed at 2021-569 in the trial court and 918 MDA 2021 in the Superior Court, and [O.K.] is docketed at 2021-570 in the trial court and 919 MDA 2021 in the Superior Court.
>
> The trial court heard testimony on the petitions for involuntary termination of parental rights as to both children at the same hearing on June 24, 2021.  Because the two cases have been linked throughout the dependency proceedings leading up to the termination hearing and the appellate issues in each case are identical, [the trial court's] opinion in both cases is identical.
>
> Mother's Concise statement raises two specific issues . . . . Mother's first error complained of on appeal claims that [the trial court] committed an error of law or abused its discretion in not holding a hearing to determine whether the denial by Lebanon County Children & Youth Services (hereinafter "CYS") of Mother's request for voluntary termination of her parental rights was reasonable.  Appellant's second error complained of on appeal claims that [the trial court] committed an error of law or abused its discretion in not holding a hearing to address Mother's voluntary relinquishment petition.  . . . .

---

[1] The decree involuntarily terminated the parental rights of both Mother and D.K., minor children's father.  Only Mother filed Notice of Appeal from the decree.

**Factual and Procedural History**

Mother and [D.K.,] Father[,] are the natural parents of R.K. and O.K. (hereinafter "Minor Children"). R.K. was born on February 26, 2017. O.K. was born February 15, 2019. The Minor Children's older half-sibling, Mother's eldest child, is involved in a separate dependency and termination of parental rights proceeding.

Per the Petitions for Involuntary Termination, Lebanon County Children and Youth Services (hereinafter "CYS") became involved with the family in April 2019, when O.K. spent four days in Hershey Medical Center for symptoms related to medical neglect and failure to thrive. O.K. was discharged from the hospital with the condition that nurses would visit to assist in the home.

A May 17, 2019, home visit showed that O.K. was gaining weight but remained in uncertain condition, with possible cognitive delays. A May 29, 2019, home visit found Mother's home where the Minor Children were living to be in "deplorable condition," with feces on the walls and carpets and infestations of cockroaches and mice.

On June 10, 2019, Mother accepted ongoing services to assist with these hygiene and health concerns, and the agency made a referral to Homemaker Services for her. On July 10, 2019, Father contacted CYS to request custody of the Minor Children, but did not have stable housing at that time.

Mother signed a Voluntary Placement Agreement for both Minor Children on September 6, 2019. However, because Father opposed voluntary placement, the conditions of the home continued to be deplorable, and it was reported that R.K. was regressing in her Early Intervention Services, CYS instead petitioned for emergency custody of the Minor Children on September 6, 2019. The [trial court] (Honorable Charles T. Jones, Jr.) granted CYS emergency custody on September 9, 2019.

Initially, both children were in the same foster care placement. R.K. received an Autism Spectrum Disorder diagnosis on October 1, 2019. She also has a diagnosis [of] Global Development Disorder. [N.T., 6/24/21, at 8]. She was eligible for, and received, services that included Therapeutic Support Staff and a sign language teacher. On January 24, 2020, R.K. was moved to a different foster care setting where the foster parent was better

able to meet her particular needs. While in placement, R.K. has progressed significantly in verbal and motor skills, learning to crawl, stand and walk, and feed herself from September 2019 to February 2020.

The Minor Children's current foster placements are their respective adoptive resources. As of the termination hearing, R.K. has been discharged from services because of her progress under foster parent's care. N.T. at 24. She attends IU13 daily and is beginning to transition from sign language to verbal speech. *Id*. Under [O.J.K.'s] foster parent's care, [he] is now developmentally on track and no longer in need of additional services. N.T. at 25.

On November 4, 2020, Mother indicated to CYS that she was willing to sign confirmation of consent to relinquish her parental rights to the Minor Children. [On December 3, 2020,] Father stated he was willing to sign confirmation of consent to relinquish his rights to R.K. but not to O.K. [].

At the permanency review hearing on December 7, 2020, the [trial court] found that the permanent placement goal of return to parent was no longer feasible and changed the permanency goal to adoption because Father had made minimal progress toward his goals and Mother, while completing most of her goals, was not able to apply the parenting skills learned through the services provided. [On June 11, 2021,] CYS filed as to each child a Petition for Involuntary Termination of Parental Rights [] seeking termination of the parental rights of both parents. CYS sought termination of Mother's rights under 23 Pa.C.S § 2511(a)(1), (2), (5), and (8), and § 2511(b).

The hearing on the Petition for Involuntary Termination of Parental Rights occurred on June 24, 2021. Guinevere Garlow was a caseworker involved in these cases and testified at the Termination Hearing that Mother and Father each have a goal plan developed in the Child Permanency Plans created when the Minor Children came into CYS custody, and their goals have mostly remained the same throughout the dependency cases. N.T. at 11. Additionally, the plans for the two children have been the same. *Id*.

Some goals were added to Mother's plan as she worked with Presley Ridge to gain and implement parenting skills. N.T. at 18. The court heard testimony during the termination hearing about

Mother's goals and progress toward completing these goals. Exhibit 5 is the May 7, 2021 Permanency Plan for O.K. prepared for the termination hearing. Exhibit 6 is the May 7, 2021 Permanency Plan for R.K. prepared for the termination hearing. Each reflects the goal plan for each parent.

Mother has made progress in her goals related to keeping a safe and clean home for the children. N.T. at 14. Homemaker Service successfully discharged her on December 18, 2020.

However, there are continuing issues related to Mother's ability to exercise proper care and control over the Minor Children. Mother has completed four parenting classes. N.T. at 15. After working with Mother for nine months, including a three-month extension, Presley Ridge unsuccessfully discharged Mother in October 2020. N.T. at 17. Presley Ridge had been working with Mother toward unsupervised visits, but to date, Mother requires prompting to attend to the children during visits and apply the parenting skills she has been taught. N.T. at 16-17.

Visits had been three hours every week under supervision of Presley Ridge and did not move to longer visits or unsupervised visits because the parenting services worker continued to need to redirect Mother and reinforce parenting skills. Mother has expressed to CYS that she feels she is unable to meet the needs of R.K. and O.K., and since Presley Ridge's services ended she has been focusing on her eldest child. N.T. at 16.

Following discharge from Presley Ridge, Mother's visit with R.K. and O.K. have been reduced to an hour every other week, supervised by CYS. N.T. at 22. Ms. Garlow testified at the termination hearing that she believes the children would not be safe in Mother's unsupervised care due to Mother's ongoing need for help in supervising the children. N.T. at 15, 23.

At the June 24, 2021 Hearing, the court also heard testimony regarding Father's non-compliance with his permanency goals, n.t. 11-13, and his criminal convictions [sexual assault of minor 8-11 years younger] preventing him from having contact with children, even his own. N.T. 18, 20, 38.

The trial court, after taking into consideration the history of the case outlined in the Petition for Involuntary Termination of Parental Rights and the fact that the Minor Children have been in

CYS custody for a period of twenty-one months as of the Termination Hearing, as well as all testimony and evidence admitted at the Hearing, terminated both Mother's and Father's parental rights to the Minor Children.

Father had not appealed the June 24, 2021 Order of Court. Mother, through her attorney, filed a Notice of Appeal and an accompanying Concise Statement of Errors Complained of on Appeal for both children's cases with the trial court on July 13, 2021.

Trial Court Opinion, 7/28/21, at 1-6.

Mother presents the following question for our consideration:

Did the trial court abuse its discretion when it failed to hold a hearing on Mother's Voluntary Relinquishment request and to determine the reasonableness of the Agency's denial of the voluntary relinquishment request by Mother?

Brief for Appellant at 4.

We review cases involving the termination of parental rights according to the following standards.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Mother contends the involuntary termination of her parental rights was improper where she presented at the June 24, 2021 termination hearing a signed Petition for Voluntary Relinquishment that was consistent with her oral representation to CYS and the court seven months earlier regarding her willingness to sign a consent to relinquish her parental rights. As she claims the trial court neither addressed her petition on its merits nor conducted a reasonableness inquiry into the Agency's alleged refusal to consent to her offer of voluntary relinquishment, she asks this Court to vacate the order.

In support of this position, she cites generally to **In re A.J.B.**, 797 A.2d 264 (Pa. Super. 2002) for the proposition that a court must set aside an unreasonable CYS refusal to consent to a parent's petition for voluntary relinquishment. In **A.J.B.**, the trial court had conducted a hearing on only the mother's petition for voluntary termination when it deemed the agency's refusal to consent thereto a "self-serving" decision issued for the sole purpose of placing an "aggravated circumstance" on mother's record that would enable an expedited procedure in any future case involving her.[2]

On appeal, this Court upheld the trial court's inquiry into whether the agency's refusal to consent to the voluntary petition was reasonable. Notably, we discerned a public policy interest in supplanting a requirement of

---

[2] Involuntary termination of parental rights establishes "aggravated circumstances," 42 Pa.C.S.A. § 6302, and thereby would permit any future termination proceedings involving other children of the same parent to be expedited by relieving DHS from the burden of providing services in support of reunification. **See A.J.B.**, **supra** at 266–67.

agency consent with a procedure providing for judicial review into the reasonableness of an agency's refusal and enabling the court to grant voluntary relinquishment when it is in the best interest of the child. *Id*. at 268. *See also In re J.F.*, 862 A.2d 1258, 1261 (Pa.Super. 2004) (acknowledging Adoption Act requirement that agency consent to accepting custody of the child until the child is adopted is tempered by Act's requirement for a hearing on a voluntary termination petition, where court independently reviews according to a standard of reasonableness).

Lebanon County CYS responds that the court properly deemed Mother's petition untimely, as it was not presented until after CYS had completed what the trial court determined to be a compelling case for involuntary termination. CYS also argues that Mother's reliance on *A.J.B.* to assail the trial court's failure to conduct a formal reasonableness inquiry into CYS actions with respect to her voluntary relinquishment is misplaced where such an inquiry is triggered by agency *refusal* of a parent's petition to relinquish her rights, and Mother never presented a petition to CYS. While Mother had indicated a willingness seven months earlier to sign a confirmation of consent to relinquish her rights, CYS posits, she took no step towards effectuating this intent by presenting such a confirmation or petition to CYS, such that there could be no refusal on the agency's part.

There is no dispute that at the November 4, 2020 permanency review hearing Mother volunteered that she would relinquish her parental rights to

O.K. and R.K. because she believed she could not meet their needs.[3] **_See_** CYS Petition for Involuntary Termination, 6/11/21; N.T. 6/24/21 at 42-46 (court acknowledging Mother's prior statement). However, neither is there any suggestion in the record that CYS opposed or objected to the notion of voluntary relinquishment at either the November hearing, the December 7, 2020 permanency review hearing where the permanency goal was changed from reunification to adoption, or at any time thereafter prior to the June 2021 involuntary termination hearing

The controversy at bar thus turns on the procedural history that followed the goal change hearing at which Mother learned she stood to lose her parental rights. Despite receiving such notice, Mother allowed six months to lapse without ever acting on her November declaration by either presenting a completed and signed confirmation of consent form for CYS approval or filing a prompt petition for voluntary termination with the court.

In fact, not until CYS had completed its case for involuntary termination through the testimonies of its witnesses at the June 24, 2021 hearing did Mother first present to the court her petition for voluntary termination. It was against this backdrop that the trial court issued its ruling that it could not entertain Mother's petition at such belated time other than to take judicial notice of both her willingness to relinquish parental rights and the evidence of record confirming her cooperation with the Agency and the good faith efforts

---

[3] The record contains no notes of testimony from the November 4, 2020 permanency review hearing.

she put forth at both her housekeeping/parenting classes and her visitations with R.K. and O.K.  N.T. 6/24/21 at 44-50.

In reviewing the trial court's ruling against conducting a voluntary termination hearing, we find dispositive this Court's decision in *In re Adoption of A.M.B.*, 812 A.2d 659, 666 (Pa.Super. 2002), which clarified that not only would a trial court be under no obligation to conduct a hearing on a parent's petition for voluntarily relinquishment once a compelling case for involuntary termination has been presented, it also would abuse its discretion by doing so:

> It is rare that a court would improperly exercise its discretion and deny an agency the legal right to obtain an Order terminating parental rights *after* [the agency] presented clear and convincing evidence that the health and welfare of the child required it.  Such would be an abuse of discretion.  To permit an Order of voluntary relinquishment after sufficient evidence for a decree of involuntary termination is presented and the reasonable effort requirements are met would be incongruous and contrary to federal and state policy of minimizing the "foster care drift" that doomed millions of children to interim, multiple or otherwise impermanent placement.

*Id.* at 667.

Here, the trial court explains that "[b]ased on the evidence already presented by CYS and [the court's own] recollection of caselaw" it could not conduct a voluntary termination hearing, as it had determined that CYS presented clear and convincing grounds for involuntary termination.  TCO, 12-13.  We discern no abuse of discretion in this conclusion, as the present case aligns with the *A.M.B*. rationale.

Specifically, by the time Mother presented her petition, Lebanon County CYS had met its burden of proving that its fulfillment of all required reasonable efforts to reach the goal of reunification had not allayed its serious concern for the health, welfare, and safety of the children if entrusted to Mother's care. The agency established that 21 months after O.K.'s four-day hospitalization for ailments related to neglect and the children's subsequent removal from deplorable living conditions and parental neglect within Mother's home, Mother, despite her earnest attempts to develop essential skills, had failed to progress adequately in her parenting classes. N.T. at 14-23.

According to CYS caseworker Guinevere Garlow, during the long course of supervised visits, Mother remained incapable of tending to the children's basic needs or anticipating potential hazards without continual prompting, and her ability to maintain concentration on the children would wane. N.T. at 15. Caring for the children was "more than [Mother] could handle," Garlow testified, as Mother simply was not able to put into practice the lessons being taught at the parenting class. N.T. at 8, 16. It was Garlow's opinion, therefore, that reuniting Minor Children with Mother posed an unacceptable risk of subjecting them to the same "medical neglect" that required hospitalization and CYS intervention nearly two years earlier. N.T. at 23.

C.Y.S.'s extensive efforts toward Mother's reunification goal also bring the present case within the scope of *A.M.B.*'s discussion regarding the Adoption Act's provision of ample procedural safeguards and rehabilitative opportunities to be afforded a parent prior to commencing with an involuntary

termination hearing.[4] It is, in part, because of the due process inherent in the agency's considerable commitment of time and resources to rehabilitating a parent, *A.M.B*. instructs, that a court must forego review of a voluntary termination petition offered in the wake of clear and compelling evidence that the health and welfare of a child justifies involuntary termination.

For the foregoing reasons, we conclude the trial court committed no abuse of discretion in declining to conduct a hearing on Mother's petition for voluntary termination. Nor did error attend the lack of a discrete, formal judicial review into the reasonableness of the agency's actions with respect to Mother's desire for voluntary relinquishment when she never presented a confirmation of consent or petition to the agency in the first place. As the court otherwise acted with sound discretion and engaged in a reasonable assessment of all evidence properly before it, we affirm the decree entered below.[5]

---

[4] *A.M.B.* notes that throughout the relevant time leading up to the termination hearing, due process rights have been observed: "extensive legal and social work, child welfare and court resources and time already had been expended, and sometimes initiated years before the termination proceeding. Filing of dependency petitions, hearings in juvenile court, adjudication of the adoptees as dependent children, and following dispositional hearings, permanency hearings, involuntary termination petitions ...." *Id.* at 670 (footnotes and emphasis omitted). Therefore, once the agency presents sufficient evidence for a decree of involuntary termination, and the reasonable effort requirements are met, allowing a voluntary termination is contrary to policy. *See id.* at 667.

[5] We note Mother does not challenge the court's findings regarding 23 Pa.C.S.A. §§ 2511(a) and (b) in favor of adoption.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/28/2021