J-A28025-24

2025 PA Super 35

| | | |
|---|---|---|
| IN THE INTEREST OF: T.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: CHESTER COUNTY DEPARTMENT OF CHILDREN, YOUTH, AND FAMILY | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2014 EDA 2024 |

Appeal from the Order Entered July 2, 2024
In the Court of Common Pleas of Chester County
Juvenile Division at No: CP-15-DP-0000028-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: T.C.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: CHESTER COUNTY DEPARTMENT OF CHILDREN, YOUTH, AND FAMILY | : | |
| | : | |
| | : | |
| | : | No. 2015 EDA 2024 |

Appeal from the Decree Entered July 1, 2024
In the Court of Common Pleas of Chester County
Orphans' Court Division at No: AD-18-0072

BEFORE: PANELLA, P.J.E., STABILE, J., and NICHOLS, J.

OPINION BY STABILE, J.:                **FILED FEBRUARY 18, 2025**

The Chester County Department of Children, Youth, and Family ("CYF" or "the Agency") appeals the July 1, 2024 decree and order in the above-captioned cases that granted a petition for voluntary relinquishment of parental rights filed by J.S. and K.M. ("Adoptive Parents") who were the adoptive parents of the male child, T.C.G. a/k/a T.G. ("T.C.G."), born in March 2007. After careful consideration, we affirm.

We gather the relevant factual and procedural history of this matter from the certified record. CYF first became involved with T.C.G.'s biological family in September 2016, due to concerns regarding lack of supervision and housing, inadequate food, domestic violence, and parental substance abuse. T.C.G. was voluntarily placed in the care of the Agency in May 2017 and subsequently adjudicated dependent in June 2017. Over the next several years, T.C.G. was placed in a succession of different foster homes, including a kinship placement with T.G. ("Maternal Great Uncle") and B.G. ("Maternal Great Aunt"). Following removal and throughout these proceedings, T.C.G. has exhibited violent outbursts and other troubling behavior grounded in "deep-rooted trauma" from his numerous "adverse childhood experience[s]." N.T., 6/7/24, at 46. This conduct has been consistent throughout these legal proceedings and occurred at school, in the courtroom, and at home.

In school, T.C.G. assaulted and threatened to "beat up other children," stole items from other students, and exhibited disrespectful and argumentative behavior to staff. *See* Permanency Review Order, 4/8/19. Between July 2019 and August 2019, alone, T.C.G. was reported to have spit on a classmate, thrown a chair ten feet across a room, and slammed another child's head against a tabletop. *See* Permanency Review Order, 6/14/19. He was regularly suspended for these and similar acts.

T.C.G. also was so unruly and destructive in each of his respective foster placements, including Adoptive Parents' home where he was reported to have, *inter alia*, intentionally broken a window by throwing rocks and constantly

absconding without permission, which required regular interventions by law enforcement. *See* Permanency Review Order, 12/11/19. Indeed, each of his respective foster placements ended as a result of the families requesting his removal due to his behavioral issues.

T.C.G. also engaged in disruptive behavior before the trial court by, *inter alia*, flipping over chairs and threatening to "jump out" of a moving car. *See id*.; *see also* Trial Court Opinion, 6/28/24, at 8-9 ("[T]his [c]ourt witnessed a full range of emotions and behaviors by T.C.G., including detachment, silence, refusal to speak beyond one-word responses, pain, frustration, anger, screaming, cursing, threats to elope [from his foster placements], and physical aggression."). At the time of his adoption in May 2021, T.C.G. had been diagnosed with attention deficit hyperactivity disorder ("ADHD"), adjustment disorder, oppositional defiance disorder, and major depressive disorder. *See* N.T., 6/7/24, at 42.

Ultimately, the parental rights of T.C.G.'s biological parents were involuntarily terminated on June 11, 2019. No appeals were filed.

On or about February 26, 2020, T.C.G. was transferred to his fourth foster placement with Adoptive Parents. *See* Permanency Review Order, 4/2/20. On April 7, 2021, Adoptive Parents filed an adoption petition with respect to T.C.G., which included consent forms executed by both T.C.G. and the Agency. Following a hearing on May 26, 2021, the trial court granted Adoptive Parents' request and entered a final decree formalizing the adoption, at which point in time T.C.G. was approximately fourteen years old.

After his adoption, T.C.G.'s behavior continued to deteriorate and escalate. ***See*** N.T., 6/7/24, at 41. Specifically, T.C.G. physically assaulted J.S. on multiple occasions, abused at least one of the family's pets, and regularly refused to remain in the house willingly without the intervention of law enforcement. ***See id***. at 28, 40-41. In late 2022, T.C.G. was additionally diagnosed with reactive attachment disorder, indicating that he would have significant difficulty in forming a lasting and permanent bond with his adoptive parents (or, indeed, any parental figure). ***See id***. at 42-44. The record also reflects T.C.G. admitted to his therapist that he had not desired to be adopted by Adoptive Parents and had only agreed to avoid "disappointing" them. ***See id***. at 41-42. On October 14, 2022, T.C.G. was admitted for "long-term treatment" in a "locked unit" at Meadowood Psychiatric Hospital due to his ongoing "physical aggression and inappropriate behaviors." ***Id***. at 58-60; ***see also*** Remote Appearance Request, 11/21/22, at 1.

On October 27, 2022, Adoptive Parents filed a private petition at docket number CP-15-DP-0000028-2017 ("Case No. 28"), requesting that T.C.G. be adjudicated dependent due to, *inter alia*, his commission of "acts of habitual disobedience" which rendered him "ungovernable" and "in need of care, treatment, or supervision." Dependency Petition, 10/27/22, at 1, 3; ***see also*** 42 Pa.C.S.A. § 6302. During these proceedings, it came to light that T.C.G. was "selling drugs" and stealing expensive electronics. ***See*** Order of Adjudication and Disposition, 11/21/22, at 1. Additionally, T.C.G. "video-taped another student using the bathroom at school and posted the video on

Snapchat to over 200 people." *Id*. at 2. T.C.G. refused to cooperate in efforts to remove this media from the public eye and the video was only recovered and deleted after the direct intervention of police detectives. *See id*.

Based upon the above allegations, the trial court concluded "without hesitation" that T.C.G. was ungovernable and in need of treatment. *See id*. Accordingly, the court adjudicated T.C.G. dependent on November 21, 2022, and established his initial permanency goal as reunification with Adoptive Parents. At the time of this determination, T.C.G. was approximately fifteen years old. Ultimately, David Van Nevel was appointed to serve as T.C.G.'s court appointed special advocate ("CASA") in these proceedings.

On November 29, 2022, the trial court filed a dispositional order directing, *inter alia*, that T.C.G. be removed from Adoptive Parents' home and placed in a psychiatric facility. Specifically, the court instructed that T.C.G. be admitted to a residential treatment program facility, Devereux, until his discharge "upon medical advice." Dispositional Order, 11/29/22, at 2.

The record also reflects that Adoptive Parents refused to take any further action on T.C.G.'s behalf, including declining to sign the paperwork necessary to enroll him in treatment. *See id*. Moreover, J.S. indicated that T.C.G.'s former room in their house had been "gutted and renovated to eliminate all vestiges of his living in [Adoptive Parents'] home." *Id*. The trial court concluded from these actions that Adoptive Parents' intent was to "abandon" T.C.G. *Id*. Nonetheless, the court directed that Adoptive Parents continue to fulfill their parental duties, cooperate with the Agency, and assist

in T.C.G.'s treatment. *Id*. at 2-3. We also note that T.C.G. concomitantly expressed his desire to never return to Adoptive Parents' home or custody. *See* Motion for Reconsideration, 12/5/22, at ¶ 20(a).

On December 1, 2022, T.C.G. was discharged from Meadowood and admitted to treatment at Devereux, which was a residential treatment facility that included "24-hour supervision." N.T., 6/7/24, at 61-62. The certified record indicates that T.C.G. remained in treatment at Devereux until February 2024. *See id*. at 62-63. During this time, T.C.G. continued to commit actions of "physical aggression" and "violence" on "several" occasions. *See id*. On February 19, 2024, he was released and placed in kinship care with Maternal Great Uncle and Great Aunt. *See id*. at 63. T.C.G.'s violent behavior continued, unabated, despite being removed from Adoptive Parents' care.

Between February 2023 and February 2024, the trial court held regular permanency review hearings. In an order issued on February 22, 2023, the court transferred physical and legal custody of T.C.G. to the Agency. These records indicate that Adoptive Parents did not engage with any of their court-ordered directives. They severed all contact with T.C.G. and the Agency. They refused to discharge any relevant parental duties. On November 15, 2022, Adoptive Parents "removed all of T.C.G.'s belongings from their home" and surrendered them to the Agency. Trial Court Opinion, 6/24/24, at 2. They also did not attend any of the permanency review hearings. Ultimately, on May 3, 2024, the trial court changed T.C.G.'s permanency goal to adoption.

Contemporaneously, on February 27, 2023, Adoptive Parents filed a petition to voluntarily relinquish their parental rights to T.C.G. pursuant to 23 Pa.C.S.A. § 2501(a) at docket number AD-18-0072 ("Case No. 72"). On March 20, 2023, the Agency filed an answer averring that it would not consent to voluntary relinquishment as required by Section 2501(b).

On March 27, 2023, the separate proceedings at Case No. 28 and Case No. 72 were transferred to the purview of a single jurist due to the case being inextricably "intertwined." Trial Court Opinion, 6/28/24, at 3.

Following a number of continuances, the orphans' court held a relinquishment hearing on June 7, 2024. The day before this hearing, the certified record indicates that T.C.G. committed a serious assault against a teacher at his school that required the victim to be hospitalized. *See* N.T., 6/7/24, at 64-65. Consequently, T.C.G. was taken into custody and detained at the Central County Youth Center ("CCYC"). On the same day, T.C.G.'s Maternal Great Aunt and Uncle informed the Agency that they could no longer continue to serve as either a kinship placement or an adoptive resource due to his ongoing behavioral problems. *See id*. at 11.

At the June 7, 2024, hearing, the court heard testimony from Adoptive Parents, T.G.C.'s CASA, CYF caseworker Ashley Sabuacak, and CYF supervisor Shawn Lewis. Additionally, the voluminous records of the legal proceedings concerning T.C.G. were admitted as exhibits without objection. Although T.C.G. did not appear or testify due to his detention at CCYC, he was

represented at the hearing by Keith DiFabio, Esquire. We note that T.C.G. was seventeen years old at the time of the relinquishment hearing.

On June 28, 2024, the trial court entered orders at both Case No. 28 and Case No. 72 that granted Adoptive Parents' request to voluntarily relinquish their parental rights. The same day, the court also filed an opinion explaining its rationale in granting the voluntary relinquishment petition despite the Agency refusing to consent. Specifically, the trial court concluded that the Agency's refusal to consent to voluntary relinquishment was unreasonable under the specific facts of this case. *See* Trial Court Opinion, 6/28/24, at 14 ("[B]ased on the unique circumstances presented in this case, it is unreasonable for the Agency to withhold consent to [Adoptive Parents'] request to voluntarily relinquish their parental rights.").

On July 29, 2024, the Agency timely filed notices of appeal along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).[1] Thereafter, the trial court filed a responsive statement pursuant to Rule 1925(a)(2)(ii) reiterating the reasoning already set forth in its earlier opinion. On August 22, 2024, this Court granted a petition filed by the Agency and consolidated the above-referenced appeals.

CYF has raised the following issues for our consideration:

_____

[1] Pursuant to Pa.R.A.P. 903(a), the Agency's notices of appeal and concise statements were due on July 28, 2024, which is a Sunday. This day was properly omitted from the timeliness computation and the Agency's submissions were timely pursuant to Pennsylvania law. *See* 1 Pa.C.S.A. § 1908.

A.      Whether the common pleas court erred as a matter of law and/or abused its discretion in finding that the agency unreasonably withheld its consent to the petition to voluntarily relinquish parental rights, where granting the petition would cause the child to be a legal orphan, the adoptive parents have the physical, mental, and financial ability to raise a child, and there is no foreseeable adoption of the child by another resource?

B.      Whether Pennsylvania courts should allow adoptive parents to abandon their child because they experience difficulties in raising their child, in the absence of demonstrating any objective physical, mental, or financial inability to parent?

C.      Whether it is in the best interest of a child to permit adoptive parents to voluntarily terminate their parental rights to that child, where the adoptive parents have not demonstrated any objective physical, mental, or financial inability to raise a child, and where there is no foreseeable adoption of the child by another resource?

CYF's Brief at 4.

Although the Agency purports to raise three separate issues in its statement of questions presented, it has only discussed one such claim in the argument section of its brief. *See* CYF's Brief at 4, 16-20. Specifically, CYF only has set forth argument concerning its first appellate issue, *i.e.*, that it was allegedly reasonable for the Agency to deny its consent to voluntary relinquishment due to the lack of a contemplated adoption. *See id*. at 16 ("CYF's withholding of its consent to termination of [Adoptive Parents'] parental rights was absolutely reasonable in light of T.C.G. having no identified adoptive resource."). Accordingly, CYF has waived its second and third issues listed above for want of discussion and citation. *See Penn-America Ins. Co. v. Peccadillos, Inc.*, 27 A.3d 259, 268 n.5 (Pa. Super. 2011) (deeming appellant's question waived upon failure to provide corresponding analysis in

- 9 -

the body of its brief) (citing Pa.R.A.P. 2119(a)). Thus, we confine our review to the Agency's first and only claim for relief.

This Court applies an abuse of discretion standard in appeals concerning voluntary relinquishment of parental rights:

> Appellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

*In re C.M.C.*, 140 A.3d 699, 704 (Pa. Super. 2016) (cleaned up); *see also In re J.F.*, 862 A.2d 1258, 1260 (Pa. Super. 2004) ("Our standard in reviewing an appeal from an order relating to termination of parental rights is to determine if the record is free from legal error and if the factual findings are supported by the evidence.").

The instant case implicates voluntary relinquishment of parental rights to an agency, which is generally governed by Section 2501 of the Adoption Act ("the Act").[2] This statutory provision provides in its entirety as follows:

---

[2] Sections 2502 and 2504 of the Act provide alternative procedures for voluntary relinquishment in the context of a contemplated adoption. *See* 23 Pa.C.S.A. §§ 2502, 2504. These statutes are not relevant to the instant case

*(Footnote Continued Next Page)*

**§ 2501. Relinquishment to agency**

**(a) Petition.**—When any child under the age of 18 years has been in the care of an agency for a minimum period of three days or, whether or not the agency has the physical care of the child, the agency has received a written notice of the present intent to transfer to it custody of the child, executed by the parent, the parent, or parents of the child may petition the court for permission to relinquish forever all parental rights and duties with respect to their child.

**(b) Consents.**—The written consent of a parent or guardian of a petitioner who has not reached 18 years of age shall not be required. **The consent of the agency to accept custody of the child until such time as the child is adopted shall be required.**

23 Pa.C.S.A. 2501(a)-(b) (emphasis added). Specifically, "[v]oluntary relinquishment deals with the routine relinquishment of . . . orphans by persons who believe they are unable, mentally or physically, to deal with the rigors of raising a child." *In re Adoption of A.M.B.*, 812 A.2d 659, 669 (Pa. Super. 2002). It is well-established that relinquishment is "mutually exclusive" from the distinct legal concept of involuntary termination. *A.M.B.*, 812 A.2d at 666; *see also C.M.C.*, 140 A.3d at 706-10.

Pursuant to Section 2501(b), the Agency is empowered to grant, or withhold, its consent as a prerequisite to the entry of a voluntary relinquishment decree. *See* 23 Pa.C.S.A. § 2501(b). That authority, however,

_____

and CYF has not raised any claims related to them. We also note that the Agency has not raised any question regarding the procedural and technical requirements appurtenant to petitions for voluntary relinquishment. *See* 23 Pa.C.S.A. §§ 2503, 2505; *see also* Pa.O.C.R. 15.2(a) ("Voluntary relinquishment to agency"). Thus, we will not address these matters further.

- 11 -

is not absolute. In ***J.F.***, this Court adopted a reasonableness standard that explicitly permits judicial review of an agency's refusal to consent to voluntary relinquishment. ***See J.F.***, 862 A.2d at 1261 ("We hold that an agency shall be held to a standard of reasonableness in its refusal to consent to a petition for voluntary relinquishment. We further hold that the trial court must independently review the agency's decision to determine if it is reasonable.").

Instantly, the Agency refused to consent to Adoptive Parents' request for voluntary relinquishment, which was overridden by the trial court. CYF contends that this decision was unsound: "Pennsylvania courts should not allow adoptive parents to abandon their child just because they experience difficulties in raising their child, in the absence of demonstrating any objective physical, mental, or financial inability to parent."[3] CYF's Brief at 18. The Agency also emphasizes that T.C.G. has no "identified adoptive resource," and alleges that "[m]aintaining the legal relationship at least allows T.C.G. not to be an orphan, which has an emotional benefit to T.C.G." ***Id***. at 20.

---

[3] The Agency also seems to suggest in passing that Adoptive Parents were required to articulate specific grounds for relinquishment. ***See*** CYF Brief at 18 (arguing that parents must place an "objective" basis to relinquish). Again, they are mistaken. Unlike the substantive grounds required by involuntary termination matters at 23 Pa.C.S. § 2511, the primary touchstone of voluntary relinquishment is whether parental consent was "intelligent, voluntary, and deliberate." ***See C.M.C.***, 140 A.3d at 711. A party seeking to disturb a voluntary relinquishment decree "must show that the consent given to terminate parental rights was not . . . clear and unequivocal." ***Id***. (cleaned up). Instantly, the Agency has not challenged the validity of Adoptive Parents' consent to relinquishment, which is entirely separate from the Agency's discrete authority to withhold consent under reasonable circumstances.

To the extent that CYF contends that Adoptive Parents were not entitled to seek voluntarily relinquishment of their parental rights due to being adoptive parents, instead of biological parents, they are mistaken. As set forth above, Section 2501 of the Act permits a "parent" or "parents" of a child to voluntarily relinquish parental rights. *See* 23 Pa.C.S. § 2501(a). The Act clearly defines the term "parent" to include adoptive parents. *See* 23 Pa.C.S. § 2102 (**"Parents."** Includes adoptive parent."). Our case law also makes clear that "[t]he family circumstances prompting voluntary relinquishment of parental rights are **highly variable**." *In re J.F.*, 862 A.2d 1258, 1261 (Pa. Super. 2004) (emphasis added). As a threshold matter, we observe no impediment to Adoptive Parents' petitioning for relinquishment.

The Agency also suggests that it was inappropriate to grant voluntary relinquishment since T.C.G. had no reasonable prospect of being adopted before reaching the age of eighteen in March 2025. *See* CYF's Brief at 16 ("CYF's withholding of its consent to termination of [Adoptive Parents'] parental rights was absolutely reasonable in light of T.C.G. having no identified adoptive resource."). Beyond this bald allegation, the Agency has offered no citations to any legal authorities suggesting that voluntary relinquishment of parental rights may only be accomplished if an adoptive resource is available. Based solely upon this lack of substantive discussion, we deem this particular line of argument to be waived. *See Penn-America*, 27 A.3d at 268 n.5.

We acknowledge, however, that this particular issue presents a difficult conundrum for Pennsylvania courts. While "[t]he Superior Court has rejected the suggestion that termination of parental rights is inappropriate when adoption is not imminent," we have concomitantly "expressed concern for terminating parental rights absent a pre-adoptive home especially in the case of an older child, whose consent is needed for adoption, lest the child age out of foster care without any permanent family." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013). These "contradictory considerations" are not easily susceptible to bright-line interpretation. *Id*. at 268-29.

Assuming, *arguendo*, that this aspect of the Agency's argument was not waived, they would not be entitled to relief under the facts of this case. While the availability of adoptive resources is a relevant factor when considering termination of parental rights, our Supreme Court has emphasized that "the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." *Id*. at 268-69. As discussed further *infra*, due to Adoptive Parents' inability to parent as well as their protracted neglect of T.C.G., there is simply no parent-child relationship left to salvage in this controversy. To the extent that the Agency expresses concerns regarding any trauma T.C.G. may suffer as a result of being made an orphan in this fashion, the record demonstrates that an even greater risk to T.C.G. may be posed by forcing him to remain in this untenable situation

against his wishes. *See id*. at 269 (observing that while "attention must be paid to the pain that inevitably results from breaking a child's bond to a . . . parent," Pennsylvania courts must "weigh that injury against the damage that bond may cause if left intact").

Specifically, the trial court concluded that the Agency's position that Adoptive Parents should continue to serve as parents to T.C.G. was "curious at best and disingenuous at worst." Trial Court Opinion, 6/28/24, at 10. Specifically, the court focused upon the "unique" facts presented by the instant case, namely, the incidents of "violence and aggression" perpetrated by T.C.G. that eventually drove Adoptive Parents to take "drastic measures to totally and completely remove T.C.G. from their lives." *Id*. at 2. The court concluded that Adoptive Parents' "consistent refusal" to undertake parental responsibilities indicated that they were "incapable of parenting" T.C.G., whom they had effectively abandoned. *Id*. at 2-3. The court observed "no connection whatsoever" between T.C.G. and Adoptive Parents at the time of these proceedings. *Id*. at 3. The court also found T.C.G. had "no desire to reunite with the [Adoptive Parents] who abandoned him." *Id*.

While conceding T.C.G. would be rendered an "orphan" by its ruling, the court reasoned that this result was compelled by the facts of this unique controversy, as follows:

> It is not in T.C.G.'s best interest to be forever legally tied to [Adoptive Parents], two people who are not his biological parents, have abandoned him, and have had no contact with him since [November] 2022. . . . This [c]ourt can see no benefit whatsoever

in perpetuating the fiction of [them] as T.C.G.'s parents, as they have failed to act as parents for an extended period.

*Id*. at 14-15. Thus, the court concluded that the Agency's decision to withhold its consent was unreasonable and granted the relinquishment petition.

In arguing that the court erred, the Agency claims that voluntary relinquishment is broadly disfavored under Pennsylvania law. ***See*** CYF Brief at 16. Again, they are mistaken, as this Court has explained:

An agency is placed in a difficult situation where its consent is requested for voluntary relinquishment. On the one hand, protection of a child requires that parents not be permitted to abandon a child because they are experiencing difficulties raising the child; nor should parents be permitted to abandon a child because of economic or other considerations. Raising children is a solemn obligation that society and the law impose on parents. **On the other hand, there are circumstances where it is clearly necessary to permit parents to relinquish voluntarily their rights to a child.** The agency must weigh all of the factors before determining whether to deny or grant its consent. Uppermost in the agency's consideration must be the best interests of the child. The courts cannot cede unlimited discretion to any governmental agency, and certainly not to a child protective agency. All governmental agencies must act reasonably. It is for the courts to review an agency's action to determine if its action was reasonable.

***J.F.***, 862 A.2d at 1261 (emphasis added). This Court has further opined that,

[w]here a parent believes that he or she cannot provide adequate care for a child, or where a parent has abused or neglected or is likely to abuse or neglect a child, it would be imprudent for this Court to place impediments in the way of the voluntary relinquishment of parental rights to a child who previously has been adjudicated dependent.

***In re A.J.B.***, 797 A.2d 264, 268 (Pa. Super. 2002). Thus, voluntary relinquishment is appropriate in circumstances when a parent is, *inter alia*,

incapable of providing adequate care to, or neglecting, their child. **See J.F.**, 862 A.2d at 1261; **A.J.B.**, 797 A.2d at 268.

The instant case does not involve mere "difficulties" encountered by Adoptive Parents in caring for T.C.G., but instead, concerns a complete breakdown in the child-parent relationship due to Adoptive Parents' abandonment of T.C.G. following years of his ungovernable behavior. The underlying facts of this case are not in dispute. As detailed at length above, the records of the dependency proceedings pertaining to T.C.G. leave no question that he has displayed a consistent pattern of violent and aggressive behavior. There also is no reasonable dispute that Adoptive Parents entirely abandoned T.C.G. following his institutionalization in October 2022, going so far as to renovate his bedroom for the purpose of removing all trace of him from their home.

The testimony adduced at the relinquishment hearing lends even further credence to the extremity of these circumstances. Adoptive Parents both testified, unequivocally, that they wished to voluntarily relinquish their parental rights. **See** N.T., 6/7/24, at 16, 22. J.S. went further in his testimony, averring that his home was no longer "suitable to children" due to the traumatic experiences they had endured while serving as T.C.G.'s adoptive parents, including being the victim of physical assaults perpetrated by the child. **Id**. at 26-28. J.S. flatly averred he was "not capable of parenting a child" and was in long-term therapy to address his traumatic experiences. **Id**.

This testimony was temporally corroborated by Ms. Sabuacak, who confirmed that Adoptive Parents had reached out to her for guidance on relinquishing their parental rights in September 2022 after T.C.G.'s behavior escalated beyond their ability to control or respond. *See id*. at 40-42. Furthermore, Ms. Sabuacak testified that T.C.G.'s diagnosis with, *inter alia*, a reactive attachment disorder indicated that he would "struggle with developing bonds" with his adoptive family. *See id*. at 43-44. Indeed, she indicated her personal belief that Adoptive Parents' inability to parent was rooted in their failure to appropriately cope with T.C.G.'s extreme behavior. *See id*. at 45-46, 51-52. Ms. Sabuacak also indicated Adoptive Parents rejected offers of "supportive services" to help them parent. *See id*. at 53.

Mr. Lewis also testified that Adoptive Parents have not accepted or initiated any communications from the Agency since November 15, 2022, when they deposited T.C.G.'s personal belongings in the care of CYF. *See id*. at 61, 80. He also averred that Adoptive Parents had put forth a "great deal of effort" in attempting to parent T.C.G., without success. *See id*. at 60, 76.

While T.C.G. was not present at the proceedings, Attorney DiFabio made the following report regarding his client's preferences:

> In regards to whether or not the voluntary termination of parental rights should move forward or whether or not [T.C.G.] wants that to occur, he has no position. He really doesn't care one way or the other, to be frank with the [c]ourt. He doesn't care about the legal ramifications if it's granted or not granted. He just doesn't want to be adopted. And he wanted to remain with [Maternal Great Uncle and Aunt].

N.T., 6/7/24, at 13. While T.C.G. did not express a particular viewpoint via Attorney DiFabio, we note that Ms. Sabuacak's testimony indicates that T.C.G. informed his therapist that he had never even desired to be adopted by Adoptive Parents in the first place. *See id*. at 51.

Similarly, T.C.G.'s CASA testified that T.C.G. had expressed "unequivocal" ambivalence regarding his relationship with Adoptive Parents: "I specifically asked about his adoptive parents and he said they're nothing to me, I don't want anything to do with them." *Id*. at 90.

Based upon the foregoing, we readily conclude that the trial court's findings and conclusions are well-supported by the certified record. The certified record overwhelmingly bespeaks that Adoptive Parents were incapable of parenting T.C.G. Furthermore, they severed all contact and began completely neglecting their adoptive son in November 2022. It is also quite clear that neither T.C.G. nor Adoptive Parents wished to perpetuate this irretrievably fractured relationship. The Agency's attempts to minimize the extraordinary circumstances of this case are unavailing. We are particularly mindful of our deferential standard of review in this context:

> [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record

and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

***C.M.C.***, 140 A.3d at 704. Overall, we discern no abuse of discretion in the trial court's reasoning, factual findings, or legal conclusions.

Decree affirmed. Order affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/18/2025